UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SCOTT M. GENOVA,

        Plaintiff,    **REPORT AND**
               **RECOMMENDATION**
 -against-         13-CV-4088 (JMA) (SIL)

THE CITY OF GLEN COVE et al,

        Defendants.
-------------------------------------------------------------x

**LOCKE, Magistrate Judge:**

 Presently before the Court, on referral from the Honorable Joan M. Azrack for Report and Recommendation in this employment discrimination and retaliation litigation, is a motion for summary judgment submitted by Defendants, the City of Glen Cove (the "City" or "Glen Cove"), the City of Glen Cove Police Department (the "Department" or "GCPD"), Chief William Whitton ("Whitton"), Deputy Chief Robert MacDonald ("MacDonald"), Sgt. Patrick Hall ("Hall"), Sgt. Jack Mancusi ("Mancusi"), and Lt. John Mandato ("Mandato") (collectively "Defendants").

 By way of Complaint filed July 18, 2013 and amended January 13, 2014 (the "Complaint"), Plaintiff, Scott Genova ("Plaintiff" or "Genova"), brings this action alleging claims under 42 U.S.C. § 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* the New York State Human Rights Law ("NYSHRL") § 296, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. *See* Complaint, DE [1]; First Amended Complaint ("Compl."), DE [24]. On May 26, 2016, Defendants filed their motion under Federal Rule of Civil Procedure 56(a) ("Rule 56") for summary judgment. DE [94-10]. Plaintiff opposes. *See* DE [94-30]. For the reasons

set forth herein, the Court respectfully recommends that the Defendants' motion be granted in its entirety.

## I.    RELEVANT FACTUAL BACKGROUND

### A.  Plaintiff's Work History with the Department

Glen Cove appointed Genova a police officer with the GCPD on July 30, 2004, and he worked in the Patrol Division as a uniformed officer until March 2009.  *See* Transcript of Deposition Testimony of Scott Genova ("Genova Tr.") 6:15-17; Compl. ¶ 35.   The terms and conditions of Plaintiff's employment were governed by the Collective Bargaining Agreement ("CBA") in force at this time, and the duties and applicable regulations for members of the GCPD, including those assigned to the Patrol Division, are set forth in the official Rules and Regulations of the GCPD ("Rules and Regulations").  *See* Defense Exhibit ("Def. Ex.") K, L.

Whitton has been the Chief of the GCPD since 2007, and, as Chief of Police, he is responsible for managing the operations of the Department, which consists of 50 officers, six detectives, eight sergeants, three lieutenants, and one deputy chief. Declaration of Chief Whitton ("Whitton Decl.") ¶ 4.  MacDonald served as Deputy Chief of the GCPD from August 2007 until January of 2015 when he retired. Declaration of Deputy Chief MacDonald ("MacDonald Decl.") ¶ 1.  Mandato held the rank of lieutenant in the Department from 2007 through to his retirement in March 2013 and served also as the administrative lieutenant, whose relevant responsibilities included shift scheduling, payroll, and training.  Declaration of Lt. Mandato ("Mandato Decl.") ¶¶ 4-5.  During the relevant time periods, Mancusi was a

sergeant with the GCPD and responsible for training desk officers. Declaration of Sgt. Mancusi ("Mancusi Decl.") ¶¶ 1, 6-7. Hall, also a sergeant with the Department, additionally served as Union President, representing Plaintiff and his fellow officers, during the relevant time period. Declaration of Sgt. Hall ("Hall Decl.") ¶ 5. The individual defendants all supervised and/or were responsible for Genova while he worked in the Department as a police officer. Whitton Decl. ¶¶ 5, 12, 16, 19, 21; MacDonald Decl. ¶¶ 19-42; Mandato Decl. ¶¶ 10-22; Mancusi Decl. ¶¶ 8-10; Hall Decl. ¶¶ 14-16.

On March 11, 2009, Plaintiff was diagnosed with Stage 4A Metastatic Nasopharyngeal Carcinoma, commonly referred to as head and neck cancer. Compl. ¶ 39; Genova Tr. at 8:13-23. As a result, Genova was forced to take a leave of absence from the Department for approximately thirteen months to undergo extensive medical treatment, which included radiation and chemotherapy. Compl. ¶ 39; Genova Tr. at 9:3-7. Due to the seriousness of his illness, Plaintiff required protracted treatment and exhausted his accrued sick time and other forms of paid leave. Genova Tr. at 15:17-25. Nevertheless, he was able to remain on the GCPD payroll due to the fact that other members of the Department, including Whitton, MacDonald, Mandato, Hall, and Mancusi, donated their accrued leave time to Plaintiff. *Id.*; Transcript of Deposition Testimony of Chief Whitton ("Whitton Tr.") 20:14-21:15; Transcript of Deposition Testimony of Sgt. Hall ("Hall Tr.") 18:4-19; MacDonald Decl. ¶ 4; Mandato Decl. ¶ 6; Mancusi Decl. ¶ 4; Def. Ex. M. Members of the Department assisted Genova during his illness by doing yardwork, taking him to medical

3

appointments, and helping watch his children.  Genova Tr. at 17:20-24; Transcript of the Deposition Testimony of Sgt. DiMaggio ("DiMaggio Tr.") 10:13 - 11:9.

In April of 2010, after his treating oncologist had determined that Genova had sufficiently recovered to return to work with duty limitations, he did so and was placed on restricted or "light duty" in the Detectives Division.  Genova Tr. at 9:6-10; Hall Tr. at 34:6-8; Declaration of Dr. Frank Tsai ("Tsai Decl.") ¶ 7; Def. Ex. Q.  When he returned to work, Plaintiff had to wear hearing-aids in both ears due to the permanent hearing loss that he suffered as a result of his cancer treatment.  Compl. ¶ 40; Genova Tr. at 11:12-20, 14:2-4.  Another reason Genova was placed on restricted duty at the time was due to his having a chemoport implanted in his chest and double vision caused by blood clots in his ophthalmic veins.  Genova Tr. at 9:11-24.  Although Plaintiff emphasizes that these conditions improved over time, Genova concedes that he still had stiffness in his bottom jaw, some speech and language issues, difficulty swallowing, and difficulty turning his head when he returned to work.  *See* Genova Tr. at 13:22, 56:17-57:15; Transcript of the Deposition Testimony of Dr. Schwartz ("Schwartz Tr.") 48:19-50:12.  Moreover, Plaintiff still suffers from tinnitus and trismus.  Genova Tr. at 13:14-15.  Throughout this time period and up until he eventually separated from the GCPD, Genova was also prescribed and taking morphine, a narcotic drug.  Genova Tr. at 9:23-24; Schwartz Tr. at 50:13-51:25; *see* Def. Ex. WW 2177.

While working in the Detective's Division, Plaintiff's duties included entering case reports, answering the phone, logging in bail money, making phone calls to

probation officers, and dropping off items at the courthouse for assistant district attorneys. Genova Tr. at 9:25-10:12; Whitton Tr. at 44:9-11. Along with the other duties already discussed, from March through August 2011, Plaintiff gave presentations at local schools about the dangers of smoking and his battle with cancer. *See* Genova Tr. at 106:4-9. The Department allowed Plaintiff to schedule his work hours around his medical appointments as he continued to recover. Genova Tr. at 28:7-25; Hall Tr. at 28:7-12. On November 9, 2010, Genova underwent surgery for the removal of the chemoport. Genova Decl. ¶ 39.

Genova's treating oncologist states in his declaration that Genova was medically cleared to work without restrictions in 2011. Tsai Decl. ¶ 8. Although Plaintiff emphasizes this point, there is no documentation submitted that was created at, near, or even in the year after the November 2010 surgery that removed the chemoport, which demonstrates Plaintiff's clearance to return to work without restrictions. *See* Genova Tr. at 55:3-25; Whitton Tr. at 149:3-16; Tsai Decl. ¶¶ 7-8. Additionally, there is no claim that Plaintiff ever advised Defendants that he had been cleared to return to full duty or submitted any documentation to the Department as part of such a request. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Application for Summary Judgment ("Pl. Opp.") at 3, 13-14; Genova Decl. ¶ 41 (claiming that Genova was restored to full patrol status because in October of 2011 "[a]t no time was [Plaintiff] ever advised [by Defendants] that [he] was not qualified for full duty assignments due to physical limitations"); Genova Tr. at 55:3-25; Whitton Tr. at 149:3-16; Tsai Decl. ¶¶ 7-8. Rather, Plaintiff relies entirely on his

own declaration to assert that "there were no other remaining impairments which effected his ability to work without restrictions."  Pl. Opp. at 3.

It was not until September 26, 2011, almost ten months later, that Genova's treating ophthalmologist provided Plaintiff with a note that cleared him to return to the shooting range in light of his double vision having resolved.  Genova Tr. at 53:9-24, 55:3-25; *see* Def. Ex R.  Subsequently, after providing this note to the Department, Genova requalified at the range and was allowed to carry his service weapon when on duty and to wear his uniform.  *See* Genova Tr. at 184:3-13.  After requalifying to use his firearm, Plaintiff did on more than one occasion go out in uniform armed with his gun.  *See* Genova Tr. at 43:16-21, 44:12-14; Whitton Decl ¶¶ 14-15; Whitton Tr. at 148:22-25; Simmons Decl. ¶¶ 4-7.  However, Genova never drove the patrol car and on all but one occasion was definitively partnered with another officer.  *See id.;* Mancusi Tr. at 34:9-35:3; Plaintiff's Exhibit ("Pl. Ex.") 41 00490-93; Declaration of Maureen Pappachristou ("Pappachristou Decl.") ¶ 18.  During this time, Genova wrote several parking tickets and one moving violation.  Pl. Ex. 41-45.

On or after December 1, 2011, though it is disputed who initiated the transfer, Plaintiff agreed to be assigned to work at the front desk of the Police Department and sought to be certified as a Desk Officer.  Genova Decl. ¶ 53; Whitton Decl. ¶ 16; Whitton Tr. at 44:6-10.  Certification as a Desk Officer was a prerequisite for being promoted to the rank of sergeant.  MacDonald Decl. ¶ 10.  The duties and responsibilities of the Desk Officer include manning the front desk; handling all forms of communication between the Department, fellow officers, and the public; and

6

maintaining various records and logs documenting the Department's daily activity. Genova Tr. at 96:5-11; Whitton Tr. at 44-45; MacDonald Tr. at 85:13-25; Def. Ex. L 001852-53.   Certification as a Desk Officer requires a training period of working at the desk while being supervised and at least one online examination.   Genova Decl. ¶ 55; Whitton Tr. at 94:2-96:24, 98:13-18; Mandato Tr. at 68:13-78:20.

From December 2011 to March 2012, Genova worked at the front desk.  Genova Tr. at 92:8-25; Whitton Tr. at 43:22-44:19.  Although Genova passed the online exam regarding the New York State police databases, Genova Tr. at 94:14-95:15, sometime late in 2012, one of Genova's supervisors, Sgt. Miller, told Plaintiff that he was going to be reassigned away from the desk because of his hearing loss.  Genova Decl. ¶ 62. Soon thereafter, on or about March 27, 2012, Mandato informed Plaintiff by phone that he was not going to be certified as a Desk Officer.   Genova Tr. at 102:16-22; Mandato Tr. at 91:1-92:24.  At a meeting held at around the same time, Mandato and Whitton stated again to Plaintiff that he would not be certified as a Desk Officer due to their concerns about deficiencies in his ability to multi-task.  Genova Tr. at 103:18-19.  Plaintiff believed that he had already been certified after an interaction with Mandato where Genova, in the role of the Desk Officer, signed off on Mandato's overtime card in the space marked "certified."   Genova Tr. at 103:7-14.    At the meeting, Whitton did not fire or threaten to fire Plaintiff and, instead, informed Genova that he would be reassigned back to the Detectives Division.  Whitton Tr. at 46:8-48:4; Mandato Decl. ¶ 19.

On April 2, 2012, another meeting occurred between the Department and Plaintiff that included, among others, Whitton, MacDonald, and Mandato.  Genova Tr. at 102: 2-4, 128:4-7; Whitton Tr. at 49-53; MacDonald Decl. ¶¶ 19-26; Def. Ex. Z. Plaintiff recorded this meeting without the knowledge of the other participants.  Def. Ex. Z.  At this meeting, Genova, who was extremely upset, stated that he wanted to "retire" or "resign" that day due to what he characterized as the harassment he had been enduring.  Def. Ex. Z 8:6-14.  Whitton and Mandato as well as other supervisors in attendance at the meeting urged Plaintiff not to resign and to think about the decision very carefully.  *See, e.g., id.* at 8:5-10:23, 21:18-21:22.  MacDonald suggested that Genova take a week off to think about what he wanted to do, and to wait until after the following Tuesday, April 10, 2012, when he was instructed to report to work for an examination by a doctor, who was in fact a psychiatrist whom the GCPD wanted Plaintiff to see for a fitness for duty assessment.  *Id.* at 23:23, 33:8-9. 35:15-16, 47:18-24.  Additionally, MacDonald explained that the Department was open to giving Plaintiff another opportunity in the future to become a Desk Officer.  *Id.* at 31:2-5.  Genova asked whether he was being fired, to which Whitton immediately responded, "No, absolutely not."  *Id.* at 36:1-2.  After being assured that he would continue to work and to be paid, Plaintiff shook everyone's hands, indicated he was thankful because he had assumed that he would lose his job after being transferred away from the front desk.  *Id.* at 44:17-21.  Nevertheless, Plaintiff never returned to work after this meeting.  Def. Ex. JJ, WW.

### B. **Plaintiff's relationship with Robert Germino**

Approximately one year before this final meeting, in April of 2011, Genova befriended Robert Germino ("Germino"), a former United States marine captain. Genova Tr. at 22:21-23:4.  That fall, Germino ran for a seat on the Nassau County Legislature against Whitton's ex-wife.  *Id.* at 22:21-23:8.  At the Glen Cove Memorial Day parade that year, Plaintiff had his photo taken with Germino and another marine.  *Id.* at 22:21-23:11.  On June 3, 2011, Germino published an online article in a local news website describing Genova's heroic battle with cancer.  *Id.* at 22:21-23:18. In September 2011, while at the Coast Guard Academy with Mancusi for a public relations event for the GCPD, Mancusi told Genova that Chief Whitton didn't mind if Genvoa was friends with Germino as long as he did not campaign with him.  Genova Tr. at at 23:19-24:9; Mancusi Tr. at 23:19-25:13.  Although Mancusi claims he warned Germino that there were rules and regulations against open support of political candidates, Plaintiff claims that Mancusi actually warned him that Whitton wanted his ex-wife to win for their daughters' sake.  *Compare* Genova Tr. at 23:19-24:9 *with* Mancusi Tr. at 23:19-25:13.  In October 2011, Genova made a $300 donation to the Friends of Robert Germino Fund, which was a publicly disclosed campaign contribution listed on a website, but told no one at the GCPD about it.  Genova Tr. at 24:10-17.  That same month, Genova gave Germino permission to place two election signs on the front lawn of 9 Frost Pond Road in Glen Cove, New York, a property jointly owned by Plaintiff and his brother where their father lives.  *Id.*

9

In November 2011, at a Veterans Day event where Genova was part of an honor guard with fellow GCPD officers, Plaintiff shook Germino's hand in front of Whitton and Hall. *Id.* at 25:8-24. According to Genova, Hall later approached Plaintiff and asked him why he shook Germino's hand at the event. *Id.* at 25:8-26:5. Two other GCPD officers also questioned Genova about the gesture. *Id.* at 25:8-27:5; 117:21-118:5. At that time, Hall as president of the PBA, was advocating for his members not to support Germino alleging that he was running on an anti-police platform. *See* Hall Tr. at 11:10-16, 51:25-52:18. At Hall's direction, the PBA made a contribution to Germino's opponent, Whitton's ex-wife. *Id.* Although some members of the GCPD were upset with Genova for publicly supporting Germino, Whitton personally liked most of Germino's political platform and, in fact, voted for him. Whitton Tr. at 52: 11-25, 55:24-56:3.

### C. Alleged Retaliation against Plaintiff's Political Activity

In October of 2011, two posters appeared at the police station, which Plaintiff interpreted to mock and deride him for supporting Germino. *See* Genova Tr. at 24:18-20, 122:9-22. One poster placed Plaintiff's head on a miniaturized body, portraying him smiling and pointing at a Germino campaign sign with Germino campaign flyers fanned out below. Pl. Ex. 22. The poster appeared in the GCPD radio room on a bulletin board. Genova Tr. at 34:1-35:5; Whitton Tr. at 86:8-11; Mandato Tr. at 7:1-8:25. Plaintiff pointed out this poster to Mandato, who took it down after their conversation, along with many other posters depicting other members of the

department, including Mandato, prior to a school visit as Mandato believed them collectively to have been inappropriate. Mandato Tr. at 9:2 - 10:22.

The second poster, Pl. Ex. 21, was created by Sgt. Peter DiMaggio while he was working at the GCPD on a departmental computer. DiMaggio Tr. at 15-25, 41-42, 64:19-25. Plaintiff and DiMaggio were childhood friends and shared an intense life-long interest in turtles as pets. Genova Tr. at 36:7-24; DiMaggio Tr. at 15:15-16:15. It depicted Plaintiff, standing between Germino and another Marine at the Glen Cove Memorial Day Parade. *See* Pl. Ex. 21. The other Marine's head was replaced with that of a Teenage Mutant Ninja Turtle, and above the parade photograph was a meme depicting the rapper Xzbit. *See id.* The meme stated, "Yo Dawg I heard you like turtles[,] [s]o we put a turtle on a turtle so you can ride a turtle that's riding a turtle." *See id.* Xzbit had a popular television show where his catch phrase was the basis of the meme featured in the second poster. DiMaggio Tr. at 16:16-17:4. The altered marine has a speech balloon containing the statement, "Oops … I voted for Delia!!!" – Delia being the first name of Germino's political opponent, Whitton's ex-wife. *See id.* Coming from Genova, a speech balloon has the dialogue, "Hey Robert, [d]on't forget to stop by headquarters later. We can talk." *See id.* The Speech balloon coming from Germino contains the response, "Oh, I will Scotty. I will. How are those darling turtles of yours." *See id.* Across the bottom of the poster is written, "Thank you, Robert, for all you do and have done," attributed to Genova, ending with the phrase "God Bless You All." *See id.*

Plaintiff alleges that these two posters were put up around the Department in public view and surreptitiously placed in his personal clipboard multiple times. *See* Genova Tr. at 24:18-20, 32:25-33:5, 119:4-121:4, 129:17-25. In Plaintiff's exhibits, there is photographic documentation substantiating the first poster being put up once, and the second poster being put up three times. *See* Pl. Ex. 21-36. The only dates connected to the emails that Plaintiff claims documented these incidents are November 2, 2011, December 18, 2011, and December 21, 2011. Pl. Ex. 26-29.

Upon the Department assigning him to the front desk, Genova reports that, instead of putting up what he found to be demeaning and derogatory signs, unknown members of the Department began drawing penis graphics and writing phrases, such as "I like penis," on his papers and materials between ten and fifteen times on or after December 2011. *See* Genova Tr. at 67:24-68:3, 112:10-114:21; Pl. Ex. 33-35. In the attached exhibits, Plaintiff provides one photograph of an unsigned penis graphic with accompanying text drawn on a City of Glen Cove violations sheet and one photograph of Genova's clip board with the unsigned handwritten phrase, "I like penis," written next to where he kept his password dated December 23, 2011. Pl. Ex. 33, 35. Genova claims that he informed two supervisors while this was happening, Sgts. Leach and Mancusi, to no avail, and that Sgt. Mancusi, told him to "man up" and "be a warrior." Genova Tr. at 115:17-25. Genova understood these drawings in conjunction with the other posters to suggest a homosexual relationship existing between himself and Germino. Genova Decl. ¶ 82.

Genova also states that in October or November 2011, he endured terrible verbal abuse from a shooting range officer, Frank Pallone. Genova Tr. at 59:15-60:7. Plaintiff, however, does not provide any explanation as to what was said or what the topic of the verbal abuse was, only that it occurred around the time that other officers were upset about his association with Germino. *See id.* Genova also alleges that unknown members of the Department had signed him up for emails regarding escort services and impotency medications and at various times hid his binder and interfered with his access to his computer. *See* Hall Tr. 58:15-18; Genova Decl. ¶¶ 164, 166, 169; Pl. Ex. 48 at 01812-14. Plaintiff provides no copies of the escort or impotency emails or text messages.

In a final act of alleged harassment, Plaintiff claims he was sent an envelope on July 23, 2012 that contained a white powder with a return address of a janitorial employee that worked at the Department. Genova Decl. ¶¶ 153-54. Genova believes without any cited evidentiary support that it was sent by members of the GCPD to continue to harass him. *See id.* Plaintiff also maintains without any evidentiary support that due to exposure to the white powder he developed bronchitis. *Id.*

**D. <u>Plaintiff's Resignation from the Department</u>**

After the April 2, 2012 meeting between Plaintiff and the Department, out of concern regarding what they believed to be Genova's deteriorating mental condition, the GCPD took Plaintiff's firearm and identification from him. MacDonald Tr. at 38:25, 39:2-25. The GCPD then scheduled a psychiatric examination of Plaintiff that was to have taken place on April 10, 2012. Whitton Decl. ¶¶ 38-39; Whitton Tr. at

110-111; Def. Ex. HH.   On April 9, 2012, Genova notified the Department that he would not be able to attend the meeting with the doctor and, instead, needed to use sick time due to chest pains, high blood pressure, and heart problems.   Pl. Ex. 75 001909-21.  From April 9, 2012 through at least May 17, 2012, Plaintiff received his salary and used his accrued time to cover his absence.  *See* Pl. Ex. 65; Def. WW, JJ, MacDonald Dec. ¶¶ 43-44.

On April 9, 2012, Plaintiff was admitted to the psychiatric unit of Huntington Hospital.  Pl. Ex. 72.  On April 19, 2012, MacDonald, at Whitton's direction, went to the Hospital to obtain a HIPAA release so that he could get Plaintiff's medical records to provide to the Department physician to aid in the anticipated psychiatric/psychological examination.   Whitton Decl ¶ 40; Whitton Tr. 101:17-25; MacDonald Tr. at 28:14-21; Whitton Decl. ¶¶ 31-34.   Plaintiff signed the release without incident, although Genova maintains that he was heavily medicated at the time and had no idea what he was signing.  *See* MacDonald Tr. 20:15-29:12.*;* Genova Tr. at 179:5-17, 179:23-180:7; Def. Ex. BBB.  According to MacDonald, Plaintiff was coherent and hugged him when he handed him the unsigned but filled out release/waiver.  MacDonald Decl. ¶¶ 31-32; MacDonald Tr. at 20-21; Def. Ex. BBB.

On April 20, 2012, Plaintiff's then treating physician submitted an out of work notice to the Department stating, "[Genova] was under my care from 4/9/12 to 4/20/12 at Huntington Hospital.  He is being referred to P.K. Partial Hospitalization for the follow up care as of 4/23/12.  At this time, he will not be back to work for appros. 4-6

14

weeks." Pl. Ex. 76.  From April 20, 2012 through May 15, 2012, Plaintiff attended an outpatient psychiatric treatment program.  Genova Tr. at 172:22-173:5; Def. Ex. MM.

Aware that Genova had been released from the hospital, the Department rescheduled that examination to May 15, 2012 at 6:00 p.m., a time that would not have interfered with any other outpatient treatment Plaintiff was receiving.  *See* Pl. Ex. 73; Defendants' 56.1 Statement ("Def. 56.1") ¶ 129; Genova Tr. at 172:22-23; Def. Ex. NN.  On May 14, 2012, Plaintiff texted Defendant MacDonald, stating he would not attend the meeting with the psychiatrist without legal counsel and due to the fact that he was at that time under the care of a treating therapist.  Genova Tr. at 172:4-173:5; Def. Ex. OO.  On May 15, 2012, Plaintiff was ordered by means of a text message to report to the Department for a meeting to take place on May 16, 2012, but Genova responded that he could not appear.  *See* Def. Ex. NN.  That same day, Plaintiff admitted himself back into Huntington Hospital, where he remained under a doctor's care until May 22, 2012.  Genova Decl. ¶ 130; Def. Ex. KK at 660.  Prior to entering the hospital, Genova filed a report with the Northport Police Department alleging that members of the GCPD were harassing him via text messages and phone calls despite his being on medical leave.  Genova Tr. at 162:5-166:2; Pl. Ex. 83.

On May 22, 2012, Plaintiff was arrested and held overnight for a domestic incident at his residence.  *See* Compl. ¶ 124; Def. Ex. RR; Genova Tr. at 175:13-19; Whitton Tr. at 114-115; MacDonald Tr. at 72:8-24.  Later, a full stay-away order of protection was issued against Genova in favor of his family relating to that incident. *See id.*; Def. Ex. SS.  Despite being required to do so under the Rules and Regulations,

Plaintiff never personally notified Glen Cove of his arrest, though they became aware of it when the arresting agency reported it to the Department. *See* Genova Tr. at 74:17-20; Whitton Decl. ¶ 58.

On May 24, 2012, Genova was ordered to report to MacDonald's office for a meeting the next day. *See* Pl. Ex. 81; Def. Ex. TT, UU; MacDonald Decl. ¶¶ 39, 40. Genova replied that he would not be able to report due to health issues. *See id.* Whitton responded that he had to report to his office by 11:00 a.m. or he would be charged with disobeying a direct order. *See id.* That same day, Plaintiff texted Whitton and MacDonald informing them that he had spoken with an attorney and was putting in for retirement based upon his medical condition and requested that they stop contacting him as he was beginning to feel harassed and intimidated. *See id.*

Genova was at that time placed on a one-year unpaid leave of absence pursuant to sections 72(1) and 72(5) of the New York Civil Service Law. [1] *See* Pl. Ex 73; Genova Tr. at 168:8-9; Macdonald Decl. ¶46. Defendants served Plaintiff on May 25, 2012

---

[1] New York Civil Service Law section 72(5) permits a municipal employer/supervisor, based upon probable cause that an employee presents a potential danger to themselves, other persons, or property or that their presence at work would seriously interfere with operations, to place that person on involuntary unpaid leave. *See* N.Y. Civ. Serv. Law § 72. New York Civil Service Law section 72(1) allows such an employer to require an employee to undergo a medical/psychiatric evaluation. *See id.* The statute provides for the employee to object to the forced leave of absence and for a hearing to be conducted within ten days of its imposition. *See id.* Additionally, were an employee to disagree with the determination of the examination, he would have a right to a hearing before an independent hearing officer within thirty days of requesting it where he would be allowed, with the aid of counsel, to challenge the determination and present his own evidence and experts. *See id.* For up to a year, the employee has the right to return to his same position once the employee is found to be medically able to do so. *See id.* Such a person may draw on any vacation, sick, or any other accrued time they have during this leave of absence. *See id.* There is no other retributive, disciplinary, or detrimental components of this form of forced leave.

16

with a letter dated May 15, 2012 to that effect accompanied by a notice of rights, the Civil Service Law sections 72 leave papers, and a copy of his psychiatric records from Huntington Hospital.  Genova Tr. at 166:10-168:19; Genova Decl. ¶¶ 132, 133; Def. Ex. QQ.  That letter noted that the Department was aware after receiving Genova's medical records that he had been hospitalized in the psychiatric department for treatment of "Psychosis, Episodic Mood Disorder and Anxiety" from April 9, 2012 through April 20, 2012.  *See* Pl. Ex. 73.  That letter, signed by MacDonald, also summarized the Departments efforts before and after Plaintiff went out on paid sick leave to have him seen by the Department's medical/psychiatric officer for a fitness for duty exam.  *Id.*  Plaintiff was also served with two disciplinary charges.  *See* Pl. Ex. 80, 81.  One charge, dated May 24, 2012, alleged that Plaintiff failed to notify the GCPD of his Northport arrest on May 22, 2012 in violation of the Rules and Regulations.  *See* Pl. Ex. 80.  The second charge, dated May 25, 2012, alleged that Genova also violated the Rules and Regulations by disobeying the direct order to report to the Department on May 25, 2012.  *See* Pl. Ex. 81.

By letter drafted by his then attorney and dated May 31, 2012, Plaintiff resigned his employment with the Department based upon "the myriad of serious medical issues" he was facing.  Def. Ex. VV.  In his declaration dated April 15, 2016, however, that attorney stated that the letter's language referred to Plaintiff's mental and emotional state at the time it was submitted.   Declaration of Edmond Chakmakian ¶¶ 7-11; Genova Tr. at 178:12-16; Genova Decl. ¶¶ 95-97.  Placing Plaintiff on involuntary leave in no way prevented him from utilizing his sick and

17

vacation time benefits to cover that time period or from returning back to his previous position if and when he recovered. *See* N.Y. Civ. Serv. Law § 72(1). Genova remained on the Department's payroll through his resignation on May 31, 2012 and specifically acknowledged in his Social Security Disability Benefits ("SSD") application that he was in fact on sick leave during that time period. *See* MacDonald Decl. ¶ 43; Def. Ex. WW 2179. Plaintiff's involuntary leave, which terminated only due to his resignation, would have guaranteed for an entire year his possible return to his position as a police officer were he to recuperate. *See* N.Y. Civ. Serv. Law § 72.

On July 6, 2012, Genova applied for Social Security Disability Benefits based upon the following conditions: (1) Nasopharyngeal Stg. 4a Cancer Basaloid Squamous Carcinoma, (2) C1 Vertebrae Damaged from Radiation, (3) Trimus  from  Radiaion, (4) Range of Motion – Turning Head L&R from Radiation, (5) Swallowing from Radiation, (6) Moderate/Severe Neurosensory Hearing Loss L&R Ears, (7) Esotropia Surgery on 6/30/2011 – Still slight double vision, (8) Anxiety Disorder / Psychosis, (9) Tinnitus – Constant ringing in both ears, (10) Neck Pain and Base of Skull (Clival Region). *See* Def. Ex. WW.  In these papers, Plaintiff also lists his medications, among them morphine for pain management, citalopram for mood, and quetiapine fumarate, known under the brand name Seroquel, for anxiety. *See id.* The Social Security Administration ("SSA") determined that Genova was in fact disabled, and unable to perform the duties of a police officer based upon his underlying diagnosis of "Neoplasm, Malignant – Other Sites (Head & Neck)," and on July 20, 2012 awarded

him SSD benefits as of April 9, 2012 – the day Genova first notified the Department he needed to use sick leave and could not come in to work.  *See* Def. Ex. WW, XX.

On April 17, 2013, the City issued Plaintiff a check in the sum of $27,411.15 representing his accrued time payout under the CBA minus any applicable severance. *See* Pl. Ex. 95.  Termination pay is regulated by the CBA, which requires notification be given the fiscal year prior to separation from the Department for payment at or near the time of separation is to take place.  *See* Def. Ex. GGG Art. 18 § 6; Hall Tr. at 23:14-16.  Additionally, an employee who resigns while disciplinary charges are pending is not entitled to an additional severance payment based on years of service. *See* Def. Ex. GGG 18:4-6.  Plaintiff received a 2012 W-2 form reporting his income that year to have been $117,911.92, which he maintains overstated his income and increased his tax liability.  Genova Decl. ¶¶ 147, 149-52; Def. Ex. 97.

Defendants now move for summary judgment, dismissing this case in its entirety.

## II.   LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Under Rule 56, summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* Rule 56(c) deems a fact "material" when its resolution "might affect the outcome of the suit under the governing law." *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 257–58 (E.D.N.Y. 2012) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.

Ct. 2505 (1986)).  The evidence alleged to substantiate a "genuine issue" must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Accordingly, an issue will be deemed genuine when "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S. Ct. 993 (1962) (per curiam); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir. 1989)).

If the moving party meets its burden, then it is incumbent upon the nonmoving party to put forth in its opposition "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ.P. 56(e)).  Such a showing must be specified and articulated and must provide more than "metaphysical doubt" that the moving party's evidence warrants judgment in its favor.  *Matsushita,* 475 U.S. at 586, 106 S. Ct. at 1356; *see Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted) (holding summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case.").

## III.  DISCUSSION

Even when viewed in a light most favorable to Plaintiff, the evidentiary record fails to present sufficient evidence to create a question of material fact with regard to each of the substantive causes of action alleged against Defendants.  For the reasons detailed herein, this lack of evidentiary support is fatal, and accordingly, the Court

respectfully recommends that the Defendants' motion be granted in its entirety and the Complaint dismissed.[2]

## A. Section 1983 Claim for Violation of Plaintiff's First Amendment Rights

First, the Court examines Plaintiff's central claim that the GCPD retaliated against Genova due to his constitutionally protected political activity in support of Germino in connection with the 2011 Nassau County legislative elections, the first cause of action in the Complaint. *See* Compl. ¶¶ 179-81.

For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable, at least in part, to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution [or laws] of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by … the United States Constitution and federal statutes …." *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689 (1979). Defendants, a municipality and municipal employees, do not dispute that, in making employment decisions regarding Plaintiff, then a police officer and, thus, a public employee, they were acting under the color of state law. *See* Def. Mem. at 8. Plaintiff claims a violation of his free speech and political

---

[2] Defendants argue in the alternative in favor of qualified immunity for the individually named Defendants and against a finding of *Monell* liability for the City of Glen Cove. Defendants Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 38-49. As the Court recommends that the case be dismissed in its entirety on other grounds, it need not address these issues.

association rights guaranteed under the First Amendment.  Compl. ¶¶ 179-81 (First Cause of Action).

The elements necessary to sustain a First Amendment retaliation claim depend upon the factual context of the claim.  *See Williams v. Town of Greenburgh,* 535 F.3d 71, 76 (2d Cir. 2008).  When a plaintiff is a public employee and brings a section 1983 claim premised upon on allegations of retaliation for political speech or association protected under the First Amendment the three-part test articulated in *Scott v. Coughlin,* 344 F.3d 282 (2d Cir. 2003), applies.  *See Kohutka v. Town of Hempstead,* 994 F. Supp. 2d 305, 317-18 (E.D.N.Y. 2014), *reconsideration denied*, 2 F. Supp. 3d 378 (E.D.N.Y. 2014) (citing *Martir v. City of New York,* 07 Civ. 7922, 2009 WL 2191332, at *5 (S.D.N.Y. July 23, 2009)).  A *prima facie* case of First Amendment retaliation requires a showing that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  *Scott,* 344 F.3d at 287; *see Johnson v. Ganim,* 342 F.3d 105 (2d Cir. 2003) (applying comparable three-part test denying defendants' motion for summary judgment in matter involving former city employee who brought suit pursuant to § 1983 against city, mayor, and labor relations officer alleging retaliation for a letter he wrote to the administration with copies sent to the U.S. Attorney's Office and other regulators criticizing the administration).  Additionally, there must be a causal connection sufficient to warrant the inference that the plaintiff's protected speech, political acts, or protected association was "'a substantial motivating factor in the adverse employment action.'"

22

*Kohutka*, 994 F. Supp. 2d at 317 (quoting *Anemone v. Metropolitan Transp. Authority,* 410 F. Supp. 2d 255, 267 (S.D.N.Y. 2006) (internal citations omitted)).

If a plaintiff produces evidence supporting all three prerequisites, a defendant can, nonetheless, prevail on a motion for summary judgment.  *See Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir. 1995); *Kohutka,* 994 F. Supp. 2d at 317.  If such a defendant can show that it would have taken the same adverse action regardless of the protected speech, then summary judgment may nevertheless be appropriate.  *See Cotarelo v. Village of Sleepy Hollow Police Dep't,* 460 F.3d 247, 252 (2d Cir. 2006); *Scott v. Coughlin,* 344 F.3d at 288 (explaining that the defendant must "show that it would have taken exactly the same action absent the improper motive").[3]  If the municipality successfully substantiates this affirmative defense, then the burden shifts back, and the plaintiff must then demonstrate by competent evidence that the proffered reasons were merely pretextual, attempting to cover up an otherwise unlawful retaliatory act.  *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 221 (2d Cir. 2004).

With respect to Genova's public acts and speech, to be protected by the First Amendment, they must be shown to relate to a matter of public concern, which would include any speech or public conduct related to "'to any matter of political, social, or other concern to the community.'" *Johnson,* 342 F.3d at 112 (quoting *Connick v.*

---

[3] In the alternative, a government employer's motion for summary judgment can prevail if it can be shown that the employee's speech was likely to sufficiently disrupt government activities in a manner that would outweigh the First Amendment rights implicated by the employee's speech. *Locurto v. Giuliani,* 447 F.3d 159, 172 (2d Cir. 2006).  This alternative theory is  inapplicable to the facts of the present matter, and therefore, the Court does not address it.

*Myers,* 461 U.S. 138, 146, 103 S. Ct. 1684 (1983)).   The First Amendment's protections, however, apply, not only to the actually articulated political speech of public employees, but also to their unspoken, but known, political beliefs and associations.   *See Branti v. Finkel,* 445 U.S. 507, 515, 100 S. Ct. 1287 (1980). Therefore, only an "overriding interest" of "vital importance" can require an employee's private beliefs to align with those of his employer; otherwise, the employee cannot be retaliated against primarily due to his political associations and opinions. *Id.* at 515-16, 100 S. Ct. at 1293; *see Elrod v. Burns,* 427 U.S. 347, 350, 96 S. Ct. 2673 (1976) (prohibiting retaliation against an employee premised upon non-affiliation with a particular political party).

Here, Plaintiff alleges four distinct acts of political speech: (1) contributing $300 to Germino's 2011 campaign for Nassau County legislature, (2) allowing yard signs in support of Germino to be placed on a property occupied by Plaintiff's father but in part owned by him, (3) his shaking of Germino's hand in the presence of other GCPD officers at a 2011 Veteran's Day Celebration, and (4) inquiring once of his superiors as to whether he could publicly support Germino.  Compl. ¶¶ 48, 51, 54, 75; Plaintiff's Rule 56.1 Statement ("Pl. 56.1 St.") ¶¶ 78-79, 80-82, 86-87; Pl. Opp. 8-10. Additionally, Plaintiff argues that public acts of association and friendship between Genova and Germino that resulted in GCPD officers believing Plaintiff at least sympathized with Germino's political stances, which were viewed by at least some GCPD officers as anti-police, constitute protected conduct.   These included: (1) Plaintiff having his photo taken with Germino and another marine at the Glen Cove

Memorial Day celebrations in 2011, (2) Germino publishing an article about Plaintiff's battle with cancer in June 2011 that contained the Memorial Day photo, and (3) Germino visiting Genova at the stationhouse in late 2011.  *See* Pl. 56.1 St. ¶¶ at 73-74, 247-248; Pl. Opp. 8-10.  It is not alleged in the Complaint or in Plaintiff's responsive papers that Genova made any other speeches, public statements, or undertook any other overt political acts in support of Germino's candidacy.  *See* Pl. Opp. 8-10; Compl.; Genova Decl. ¶ 72.

1.   Special Limitations on Political Expression for Members of Law Enforcement

Defendants do not dispute that Genova's contribution to Germino's campaign and his placement of campaign signs on a property, which he partially owned, were acts of political speech on a matter of public concern, the local election.  *See* Def. Mem. 21-22.  Nevertheless, Defendants correctly contend that in and of themselves these acts cannot satisfy the necessary element of implicating protected speech, because they are barred by the Rules and Regulations.  *See* Def. Ex. L. 001868, 1871.

Though Genova, as a public employee, has a strong interest in engaging in political speech and activities as a citizen, special governmental interests unique to law enforcement allow the government to prohibit him from making campaign contributions to and/or publicly supporting Germino.  *See Hosrtkoetter vs. Depart of Public Safety*, 159 F.3d 1265, 1273 (10th Cir. 1998); *Purdy v. Town of Greenburgh*, 166 F. Supp. 2d 850, 860 (S.D.N.Y. 2001), *modified on reconsideration in part*, 178 F. Supp. 2d 439 (S.D.N.Y. 2002) (recognizing continued applicability of determination in *Purdy v. Kreisberg*, 47 N.Y.2d 354, 361, 418 N.Y.S.2d 329 (1979), that New York

25

State municipal regulation prohibiting police force members from using their office or authority in aid of or against any political party did not violate First Amendment); *Lecci v. Looney*, 33 A.D.2d 916, 307 N.Y.S.2d 594, 595 (2d Dep't 1970), *lv. denied,* 26 N.Y.2d 612, 310 N.Y.S.2d 1025 (upholding, as constitutional, local police regulation that prohibited officers from personally engaging in politics and from participation in any movement for the nomination or election of candidates for public or political office). The valid governmental objectives of assuring law enforcement officers that they themselves are not obligated to publicly display their political affiliations and of assuring the public that police actions are not substantially predicated upon political motives outweigh the individual officer's interest in his First Amendment rights and allow for the more stringent regulation the officer's political activities; including prohibiting participation in acts aimed at influencing voters, contributing to campaigns, endorsing political candidates, and/or the displaying of political signs in an officer's own yard. *See Hosrtkoetter,* 159 F.3d at 1274-75 (finding no constitutional violation in prohibiting members of law enforcement from displaying yard signs or bumper stickers); *see also Perry v. St. Pierre,* 518 F.2d 184, 186 (2d Cir. 1975) (upholding as constitutional a municipal regulation that proscribed police officers from soliciting a person to vote at any political caucus, primary, or election for any candidate or to attempt to influence any voter); *Wickers v. Goodwin*, 813 F. Supp. 676, 681 (E.D. Ark. 1992) (upholding a statute that, in part, regulated law-enforcement political contributions). Consistent with these policy objectives, Rule 80 of the Rules and Regulations states, "[N]o member of the force shall be permitted to be a delegate

26

or representative to, or hold office in a political party, *or in any way take part in a nomination or election campaign for public office.*"  *See* Def. Ex. L 001871 (emphasis added).  Rule 41 prohibits "[p]articipating in, or contributing to, any partisan political activity or campaign."  *Id.* L 001868.   Accordingly, Genova's two yard signs and his contribution to Germino's political campaign, in light of his position as a police officer, are not protected activities under the First Amendment and cannot themselves support a cognizable section 1983 claim.

### 2.   Public Purpose

Genova's remaining acts of political speech also fail to satisfy the first prong of the *Scott* test because, although they occurred in a political context, they lacked any broader public purpose.  In reaching a determination as to whether a specific act of public-employee speech is protected by the First Amendment, the focus is "on the motive of the speaker … to determine whether the speech … had a broader public purpose."  *See Lewis v. Cowen,* 165 F.3d 154, 163-64 (2d Cir. 1999) (citing *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1212 (10th Cir. 1998)).  Genova's shaking hands with Germino at the Veteran's Day Parade or taking a photograph with him at the Memorial Day parade specifically because Germino was a veteran and/or Plaintiff's friend were acts not motivated by nor commenting upon a matter of public concern as would trigger the protections of the First Amendment.  *See Wrobel v. Cty. of Erie*, 692 F.3d 22, 28 (2d Cir. 2012) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684 (1983)) ("'When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the

community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.'").

Nevertheless, Plaintiff's explicit expression of support for Germino as a candidate by inquiring with Mancusi about publicly campaigning for him warrants the protections of the First Amendment and satisfies the basic requirements of this first factor.  Genova Tr. at 24:4-7; Mancusi Tr. at 24:8-25:13.  Additionally, Plaintiff's publically-known private support of and general association with Germino as a candidate, as illustrated in the posters at issue, itself independently merits First Amendment safeguards.  *See Lorusso v. Borer*, 359 F. Supp. 2d 121, 131 (D. Conn. 2005) (holding plaintiff's retaliation claims clearly meet the "public concern" requirement because the right to support and to vote freely for a candidate without fear of reprisal is protected by the First Amendment).

3.    Adverse Employment Action

As aspects of Plaintiff's claims satisfy the initial requirements for a First Amendment violation, the Court next examines whether a reasonable juror could determine that in retaliation for his political beliefs, associations, and/or activities Genova suffered an adverse employment action.  To this end, Plaintiff raises multiple alleged adverse employment actions that he suffered, including a hostile work environment, having his job duties changed, suffering harassment and retaliation while on paid medical leave, being disciplined, having his pay withheld, and purposeful misrepresentations being inserted into his income tax reporting materials.  Pl. Opp. 4-5.

28

An adverse employment action in the context of a First Amendment 1983 claim requires a plaintiff to show only that the retaliatory conduct in question "'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Nixon v. Blumenthal,* 409 F. App'x. 391, 392 (2d Cir. 2010) (quoting *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir. 2006)). Such actions include, but are not limited to, discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. *See Murray,* 853 F. Supp. 2d at 264 (citing *Frisenda v. Inc. Vill. of Malverne,* 775 F. Supp. 2d 486, 510 (E.D.N.Y. 2011) (applying *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999))). A combination of more minor adverse actions may collectively constitute retaliation when what would otherwise be *de minimis* incidents "reach a critical mass" and create "a working environment unreasonably inferior to what would be considered normal for that position." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).

Nevertheless, if the conduct at issue is minor and isolated or infrequent it will not meet the necessary "critical mass" threshold. *Phillips,* 278 F.3d at 109 ("Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a long period of time may be actionable…."). Such incidents must exceed mere disruption, inconvenience, and/or a simple alteration in job responsibilities. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004)) (emphases omitted); *Nixon,* 409 F. App'x. at 392.

a) Hostile Work Environment

29

The Court turns first to the question of whether the evidence supports Plaintiff's allegation that Genova suffered a hostile work environment. A plaintiff makes out a hostile work environment claim by showing: (1) intentional harassment (2) based on political affiliation (3) under color of state law that is (4) sufficiently extensive to render the work environment hostile to plaintiff. *See Dawson v. County of Westchester,* 351 F. Supp. 2d 176, 194 (S.D.N.Y. 2004) (citing *Lange v. Town of Monroe,* 213 F. Supp. 2d 411, 423 (S.D.N.Y. 2002).[4] With respect to the fourth factor, whether a workplace environment may be considered sufficiently hostile or abusive to support a claim is to be measured by an objective-subjective totality of the circumstances test. *See Harris,* 510 U.S. at 21-23, 114 S. Ct. at 370-71; *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 18 S. Ct. 2275, 2283 (1998); *Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir. 1999). Under this test, the Court must consider a variety factors, including the frequency and severity of the conduct at issue, whether such conduct is physically threatening or humiliating, or merely an offensive utterance, and whether the conduct unreasonably interferes with the plaintiff's work performance. *See Morin v. Tormey,* 620 F. Supp. 2d 353, 363 (N.D.N.Y. 2009), *aff'd,* 626 F.3d 40 (2d Cir. 2010) (precluding summary judgment on plaintiff clerk's First Amendment § 1983 claim for hostile work environment where genuine issue of material fact existed as to defendants' actions; which included refusing to provide clerk with resources and staff needed to perform her job, re-

---

[4] As there are no controlling standards in this Circuit regarding how to assess hostile work environment claims for political association under Section 1983, the Court properly may rely on precedent stemming from Title VII claims. *See Kohutka,* 994 F. Supp. 2d at 323 (collecting cases and applying *Dawson*).

assigning clerk to remote courthouses, and constantly soliciting negative information about clerk from her co-workers all after plaintiff refused defendants' request to spy on their political opponent and be a "team player" and a "good Republican").  To satisfy the objective component of the analysis, the conduct must be offensive or pervasive enough to create an environment that a reasonable person would find hostile or abusive.  *See id.*; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998) (noting that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances") (internal citations omitted); *Carrasco v. Lenox Hill Hosp.*, 99 CIV. 927, 2000 WL 520640, at *6 (S.D.N.Y. Apr. 28, 2000), *aff'd*, 4 F. App'x 29 (2d Cir. 2001) (quoting *Faragher*, 524 U.S. at 788, 118 S. Ct. 2283-84) ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *cf. Smeraldo v. City of Jamestown,* 512 F. App'x. 32, 35 (quoting *Harris,* 510 U.S. at 21, 114 S. Ct. at 370-71) ("A plaintiff presents an actionable claim of a hostile work environment 'when the work place is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive working environment.'").

Genova has not submitted sufficient evidence that his workplace was so permeated with intimidation and ridicule stemming from his association with Germino or in response to his inquiry about supporting his campaign as to constitute a hostile work environment.  Genova only vaguely references that "numerous posters"

31

of him were posted, and fails to give any specific dates or even the number of instances. *See* Genova Tr. at 34:1-35:1, 67:20-69:11, 129:14-131:25, 136:24-137:17, 138:5-141:3; Genova Decl. ¶¶ 80-81. There is only objective evidence of three postings and/or hiding instances regarding the first poster and one instance of posting regarding the second turtle-related poster. *See supra* at 11. Beyond claiming that someone drew penises on his property and wrote the phrase "I like penis," Genova's claims that the officers repeatedly teased and talked negatively about him are vague or unattributed. *See* Genova Tr. at 59:5-21, 113:23-114:21; *See, eg.,* Pl. Ex. 48 01796, 01812-13. Further, even assuming the additional teasing occurred, unlike the posters, these arguably crass and unprofessional acts do not directly or indirectly reference any of the allegedly protected political conduct Plaintiff undertook in support of Germino or markedly differ from how all of Genova's fellow officers were treated. *See id.* Additionally, despite Plaintiff's conclusory assertions to the contrary, the posters that do relate directly to Genova's political association and support of Germino, objectively do not contain any derisive or obscene material. *Compare* Def. Ex. BB, FF *with* Def. Ex. GG. With respect to the hiding of Plaintiff's binder, and the receipt of unwanted impotency and escort emails, Genova provides no testimony or other evidence explaining when these events occurred or who committed these acts, and he has not articulated any nexus between these alleged acts and his political support for Germino. Genova Tr. at 67:20-68:3, 113:23-114:21, 119:4-121:22, 122:23-123:12, 129:14-131:5, 131:12-24, 136:24-137:17, 138:5-139:10, 140:7-24; Genova Decl. ¶¶ 79, 82, 84, 85, 164, 166; Def. Ex. Z 6:1-7, 26:1-28:12.

In sum, the individual events described above do not, as a matter of law, even when viewed in a light most favorable to the Plaintiff, reach the critical mass required to constitute a hostile work environment, let alone a hostile work environment causally connected to any protected speech. *See Tepperwien v. Entergy Nuclear Operations,* 663 F.3d 556, 572 (2d Cir. 2011) (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.,* 138 F.3d 33, 38 (2d Cir.1998)) ("Individually the actions were trivial, and placed in context they remain trivial.  Taken in the aggregate, the actions still did not adversely affect [the plaintiff] in any material way. 'Zero plus zero is zero.'"); *Murray*, 853 F. Supp. 2d at 265-68 (holding the *Tepperwien* Title VII rationale applicable to First Amendment retaliation context); *cf. Marshall v. NYC Bd. of Elections*, 322 F. App'x 17, 18-19 (2d Cir. 2009) (quoting *Oncale*, 523 U.S. at 80, 118 S. Ct. at 1002) (holding that supervisor's offensive and harassing alleged conduct, which included references to lunch dates and weekend outings with his same-sex partner, showing employee a sexual device he had purchased for his partner, standing over employee with clenched fists on several occasions, disparaging employee's educational background, and engaging in crass behavior, did not rise to the level of severity necessary to constitute a hostile work environment, noting that Title VII is not a "'general civility code for the American workplace,'" prohibiting instead only harassment that is discriminatory).  None of the conduct at issue here was physically threatening, most acts made no reference to Genova's political activities, and none of it on its face appears reasonably to be capable of intimidating or dissuading Genova from supporting Germino.  Accordingly, Plaintiff's claim that he suffered a hostile

work environment in violation of his First Amendment rights is not supported in the evidentiary record before the Court sufficient to survive summary judgment

> b)  Loss of Uniformed Patrol and Transfer to the Front Desk

Genova also fails to substantiate that subsequent to his public support of Germino's campaign he suffered an adverse employment action in being removed from patrol assignments and being transferred from the Detectives Division to the front desk and then back to the Detectives Division.   Preliminarily, the Court acknowledges that with respect of the loss of patrol duties, such an alteration in job responsibilities could constitute an adverse employment action.   *See, e.g., Boata v. Pfizer, Inc.*, No. 10 CIV. 4390, 2013 WL 432585, at *5 (S.D.N.Y. Jan. 31, 2013), *aff'd*, 554 F. App'x 73 (2d Cir. 2014) (holding in the context of summary judgment evidence of a significant loss of responsibilities and transfer satisfies the requirement that plaintiff must show an adverse employment action).   Here, however, there simply is no evidentiary support that such a loss or alteration actually occurred.   For a change in employment to be found to be materially adverse it "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."   *Murray*, 853 F. Supp. 2d at 264.   More importantly here, a plaintiff's subjective perception that a change in assignment is a demotion is not enough to substantiate an adverse employment action claim.   *See Islamic Soc'y of Fire Dep't Pers. v. City of N.Y.*, 205 F. Supp. 2d 75, 87-88 (E.D.N.Y. 2002) (citing *Garber v. N.Y.C. Police Dep't*, 159 F.3d 1346 (2d Cir. 1998) (holding unhappiness about the transfer does not itself substantiate a constitutional violation in the context of a Title VII claim)).

34

Plaintiff's essential allegation is that the specific transfer to the Desk Officer position removed him from full uniformed patrol duty and placed him in a new, less desirable, clerical assignment. *See* Pl. Opp. 13-15. There is no evidence for a jury to consider that could support this conclusion. First, from before Plaintiff became associated with Germino through to his eventual transfer to the Desk Officer position, Genova was assigned to the Detectives Division on restricted duty, not on full uniformed patrol duty. *See* Whitton Decl. ¶¶ 11-16; MacDonald Decl. ¶¶ 6-8; *See, e.g.,* Genova Tr. at 9:13-24; 10:4-12, 21:9, 28:7-25. Plaintiff is correct that during this time he was, on a very limited basis, allowed to ride with Officer Simmons and wrote several parking tickets and one moving violation, but Genova's predominant work assignment throughout this time period was with the Detectives Division, whether or not he wore a uniform at work and/or carried his service weapon. *See* Genova Tr. at 43:16-21, 44:7-18, 44:12-14, 50:25 - 51:2; Whitton Tr. at 148:22-149:2, Def. Ex. T; In fact, on or about November 21, 2011, Plaintiff wrote a letter to the Department asking to modify his work hours to attend adult swim therapy, stating that he was working his way back to using his fire arm, which reasonably demonstrates that it was Genova's own belief at that time that he was not restored to full duty. *See* Def. Ex. S. Furthermore, there is no allegation or evidence that Genova's pay, schedule, or any other material aspect of his employment was negatively impacted by the transfer from the Detectives Division to the Desk Officer position or his return to it.

Moreover, the Desk Officer responsibilities bore a substantial similarity to the duties Genova was previously performing. The duties of a Desk Officer encompassed

the clerical aspect of Genova's role in the Detectives Division and added to it responsibility for overseeing communication between the Department and public in person, through 911, and over the phone. *Compare* Exhibit L 001852-001853. *with* Genova Tr. at 10:4-12; Whitton Tr. at 44:6-45:11. The Desk Officer was a hub for intra-departmental communication among the officers. *See* Mandato Tr. at 72:19 - 73:16; Mancusi Decl. ¶ 7, Mancusi Tr. at 45:14-20; Declaration of Police Officer Suzanne Zoll ("Zoll Decl.") ¶ 4; Exhibit L 001852-001853. Genova was offered and accepted the transfer to the Desk Officer position; there is no evidence that it was forced on him or that it was considered by anyone to be a demotion. Genova Decl. ¶ 53; Whitton Decl. ¶ 15; Whitton Tr. at 44:6-45:23. In fact, obtaining Desk Officer certification was actually a prerequisite for promotion within the Department and would have better solidified Plaintiff's future with the GCPD. MacDonald Decl. ¶ 10; Mancusi Tr. at 28:3-16. Accordingly, there is no objective evidence before the Court that the transfer negatively impacted Plaintiff's career or was a material change in his duties from the Detectives Division prior to the transfer.

Though Genova expresses repeatedly his personal belief that he had been returned to work without any restrictions, prior to the transfer to Desk Officer, there is no evidence corroborating that subjective opinion from which a reasonable juror could find that this was in fact the case. *Compare* Genova Tr. at 51:6-7*;* Whitton Tr. at 149:3-16; Mandato Decl. ¶ 21; Macusi Decl. ¶ 5, Mancusi Tr. at 50-51; Hall Decl. ¶ 11; Def. Ex. P *with* Genova Tr. at 43:14-21; Genova Decl. ¶¶ 41-49. So, "[w]hile the Court is mindful that it should not make credibility findings, '[w]hen opposing parties

36

tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Museau v. Heart Share Human Servs. of N.Y.,* 12-CV-1851, 2014 WL 1277006, at *5 (E.D.N.Y. Mar. 27, 2014) (quoting *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769 (2007)); *accord Matteo v. Kohl's Dep't Stores, Inc.,* 2012 WL 760317, at *7 (S.D.N.Y. Mar. 6, 2012) (granting summary judgment for defendant and concluding that the wheels on a display protruded no more than three inches into a shopping aisle, rather than the six to twelve inches suggested by plaintiff, as photographs in evidence contradicted plaintiff's testimony on the placement of the display).  All of the evidence instead suggests that that Genova never returned to work as a full duty patrol officer following his cancer treatment.  *See supra* at 4-7.  There is no evidence of a physician's note or other assessment existing contemporaneously with Plaintiff's alleged return to full uniformed patrol work, nor is there any evidence suggesting such a transfer and reinstatement actually took place.  *See* Genova Tr. at 55:3-25; Ex. Whitton Decl. ¶ 15, Whitton Tr. at 149:3-16; Def. Ex. P, R.  Moreover, there is no evidence that Plaintiff or anyone acting on his behalf ever notified Defendants at this time that he was cleared for unrestricted duty.  *See* Pl. Opp. at 3, 13-14.  This conclusion is confirmed by Genova's ophthalmological note that cleared him to return to the firing range approximately nine months later.  *See* Def. Ex. R.  If Plaintiff had already been cleared to work without restrictions, this note would not have been necessary. *Compare* Def. Ex. R *with* Tsai Decl. ¶ 8.

The only evidence Plaintiff cites are the declarations of Dr. Frank Tsai, Genova's oncologist, and Dr. Schwartz, Genova's psychiatric expert, to demonstrate that Plaintiff was "cleared to return to work in full capacity without restrictions." Pl. 56.1 St. ¶10. That Dr. Tsai presently believes that Genova was cleared and able to return to work without restrictions during the relevant time period does not reasonably establish that Plaintiff was, in fact, so cleared and reinstated at the time. Dr. Tsai did in fact issue a clearance for Genova to return to work "on restricted duty" specifically for "clerical work." Tsai Decl. ¶ 7. He did not produce a subsequent letter or note memorializing his conclusion that in 2011 Genova was in fact fully cleared. *See id.* Additionally, and as set forth above, evening assuming Dr. Tsai did make that conclusion at the time, there is no evidence in the record nor even an allegation that Genova ever communicated this development in a manner as would have put his employer on notice of this radical improvement in his condition as would have initiated the process of reinstating him fully and reassigning him back to patrol. *See* Genova Tr. at 55:3-25; Whitton Decl. ¶ 15, Whitton Tr. at 149:3-16.

The proffer of Dr. Schwartz's conclusions does not rehabilitate Genova's argument. Dr. Schwartz concedes that he has no firsthand knowledge of Plaintiff's condition back in 2011 and no knowledge at all of the criteria necessary to qualify Plaintiff as fit for duty. Supplemental Report and Declaration of Dr. Schwartz ("Schwartz Decl."). Dr. Schwartz's opinions are primarily based on Genova's subjective representations. *See* Pl. Ex. 15 Addendum C. The strongest statement he offers is simply that there is "no evidence that Mr. Genova was not capable of

returning to work." Schwartz Decl. ¶ 32.  Moreover, Dr. Schwartz acknowledges that Plaintiff had in 2011 and still suffered at the time of his Declaration permanent bilateral hearing loss, vision impairments, limited range of motion in his neck, speech issues, stiffness in his bottom jaw, difficulty swallowing, difficulty turning his head, limited range of motion in his neck, and was under pain management requiring morphine.  Schwartz Decl. ¶¶ 8, 9, 13-16, 19-24.

Accordingly, even when drawing all the reasonable inferences in favor of the Plaintiff, the Court determines that there is no material question of fact in the evidentiary record that Genova suffered any loss of responsibilities or change in job duties based on his transfer sufficient to constitute a cognizable adverse employment action claim.

### c)  Constructive Discharge

Genova also maintains that he suffered a constructive discharge from the GCPD due to his political affiliations, which, if true, would satisfy the requirements of an adverse employment action.  However, no reasonable juror could determine that this in fact occurred based upon the evidentiary record.  A constructive discharge occurs when an employer intentionally creates an "intolerable work atmosphere" that compels an employee involuntarily to quit or otherwise resign.  *See Andersen v. Rochester City Sch. Dist.,* 481 F. App'x. 628, 632 (2d Cir. 2012), *cert. denied,* 568 U.S. ——, 133 S. Ct. 836 (2013), (quoting *Serricchio v. Wachovia Secs. LLC,* 658 F.3d 169, 185 (2d Cir. 2011) (evaluating claim for constructive discharge in violation of Title VII, the NYSHRL and the First Amendment).  Constructive discharge requires more than for a plaintiff to resign instead of facing potential disciplinary charges.  *Bailey*

*v. N.Y.C. Bd. of Educ.,* 536 F. Supp. 2d 259, 266 (E.D.N.Y.2007).  Nor is it enough for a plaintiff to fear termination unless such a fear is based upon specific threats of discharge by the employer.  *Compare Massie v. Ikon Office Solutions. Inc.,* 381 F.Supp.2d 91, 96-100 (N.D.N.Y. 2005) (holding that "fear of being terminated [was] not an adverse employment action") *with Grey v. City of Norwalk Bd. of Educ.,* 304 F. Supp. 2d 314, 324 (D. Conn. 2004) (finding that "threats of termination alone are sometimes sufficient to show constructive discharge") (citing *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987) (finding that threat to fire employee after probationary period "no matter what he did to improve his allegedly deficient performance" was sufficient to support a finding of constructive discharge")).

As outlined above, the actual harassment Genova experienced that is supported in the record simply does not rise to a level that would support a finding of constructive discharge.  *Compare supra* at 29-33 *with Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) ("[A] merely discourteous working environment does not rise to the level of a First Amendment violation"); *Faragher,* 524 U.S. at 788, 118 S. Ct. at 2284 (holding that "simple teasing, offhand comments, and isolated incidents, unless extremely serious," will not give rise to an actionable change in the conditions of employment in the context of discrimination claims under Title VII).

Further, the fact that Genova resigned his position with disciplinary charges pending effectively bars the claim all together.  "[W]hen an employee resigns rather than responds to disciplinary charges, the resignation cannot later be construed as a constructive discharge." *Bailey v. New York City Bd. of Educ.,* 536 F. Supp. 2d 259,

266 (E.D.N.Y. 2007); *see Phillips v. Mt. Sinai Med. Ctr.*, 01 CV 5656, 2006 WL 177155, *1, *4 (S.D.N.Y. Jan. 24, 2006) (granting summary judgment to employer on retaliation claim where termination occurred three months after the filing of an EEOC charge and numerous disciplinary actions predated the filing).  Plaintiff resigned while two separate disciplinary charges were pending, the first was for failing to report his domestic violence arrest, and the second for insubordination in refusing to report for his fitness for duty examination.  Genova Decl. ¶¶ 132, 133; Def. Ex. QQ.  Genova was served with papers that explained his rights and options in light of the disciplinary charges, and, additionally, he was given a one-year leave of absence with a right to return to the GCPD once he was proven fit for duty.  Genova Tr. at 166:10-11; Whitton Decl. ¶ 59; MacDonald Decl. ¶ 45; MacDonald Tr. at 52:6-8, 94:16-17; Def. Ex. QQ.  Instead of taking advantage of the leave of absence or following through with any of his disciplinary options, Plaintiff voluntarily chose instead, with the advice of counsel, to resign based upon his medical condition.  *See* Def. Ex. VV; *see also Spence,* 995 F.2d 1147; *Silverman v. City of New York,* 216 F. Supp. 2d at 116 ("the fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation"); *Katz v. Beth Israel Med. Ctr.,* 95 Civ. 7183, 2001 WL 11064, *13 (S.D.N.Y. 2001) (no constructive discharge where employee voluntarily resigned after at least one threat of termination instead of filing grievance pursuant to collective bargaining agreement); *Stembridge v. City of New York,* 88 F. Supp. 2d 276, 284-85 (S.D.N.Y. 2000) (no constructive discharge

41

where employee failed to avail himself of right to appear with counsel at informal conference to challenge suspension without pay; "in light of the fair hearing and opportunity to be heard before an independent arbiter, a rational jury could not plausibly find that a reasonable person in plaintiff's situation would have felt compelled to resign"). Accordingly, Plaintiff's constructive discharge claim fails as a matter of law.[5]

### 4. <u>Causality</u>

Even if the Court were to assume that Plaintiff has established genuine issues of material fact as to whether he suffered adverse employment actions, summary judgment in Defendants' favor would nevertheless be appropriate because Genova is unable to show that Plaintiff's association with and support for Germino's campaign for the County Legislature motivated their conduct. In order to establish a First Amendment Claim, a causal connection between the speech and adverse action must exist "so that it can be said that [the] speech was a motivating factor in the determination." *Morris,* 196 F.3d at 110. This can be established "either indirectly by means of circumstantial evidence … or directly by evidence of retaliatory animus."

---

[5] In opposition, Genova emphasizes Mancusi's alleged statement urging Plaintiff to "man up" and "be a warrior" in the face of teasing or Whitton's comment that "sometimes the bullies don't even realize their bullies." Genova Tr. at 115:16-116:7; Pl. Ex. 48 01801-02. Though in a light most favorable to a plaintiff these statements might evince a lack of concern about an employee's situation, they still do not support an inference that the employer intended to create intolerable workplace conditions, which is required to sustain a constructive discharge theory premised on workplace harassment by co-workers. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000). Especially because Defendants collectively demonstrated an ongoing interest in retaining Genova, promising to allow him to reapply for the Desk Officer position and repeatedly stating that he was not going to be fired and would always have a job with the GCPD, Plaintiff's cause of action for constructive discharge is not supported by the record. *See Id.*; Ex. Z 10:14-15; 31:2-5; 36:1-2.

*Id.*  With respect to circumstantial evidence, a plaintiff may rely on the temporal proximity of the protected conduct and the adverse employment action.  *See Raniola v. Police Commissioner William Bratton,* 243 F.3d 610, 626 (2d Cir. 2001); *Donovan v. Inc. Vill. of Malverne,* 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008) (citing *Woods v. Enlarged City Sch. Dist.,* 473 F. Supp. 2d 498 (S.D.N.Y. 2007)).  Nevertheless, a plaintiff cannot survive summary judgment based upon "conclusory assertions of retaliatory motive" to satisfy the required causal link between the employment action and conduct alleged to be protected under the First Amendment.  *Brady v. Cty. of Suffolk*, 657 F. Supp. 2d 331, 354 (E.D.N.Y. 2009) (holding that nearly eighteen-month time lapse between allegedly protected speech and adverse action, absent other direct evidence of retaliatory motive, did not support finding of nexus between the two).  Instead, Plaintiff must put forth "'some tangible proof to demonstrate that his version of what occurred was not imaginary.'" *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (quoting *Morris*, 196 F.3d at 111) (alteration omitted).  In determining the existence of a causal connection between the protected speech and the alleged retaliatory conduct, the Court is mindful that "[c]ausation generally is a question for the finder of fact." *DePace v. Flaherty,* 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002).

Applying these standards, there is no admissible evidence in the record that reasonably suggests retaliatory animus regarding Plaintiff's support for Germino having motivated Defendants' various employment decisions concerning Genova's assignments or his treatment in the Department.  Even the posters, although they did arguably tease Genova about his support of Germino and Plaintiff's acknowledged

affinity for pet turtles, objectively are not malicious, patently obscene, physically threatening, or suggestive of retribution aimed at negatively impacting the Plaintiff's career as a punishment for his political support for Germino. *See supra* at 10-11; Pl. Ex. 21, 22.

Further, the time lapse between the protected conduct and any of the alleged adverse employment actions prevents the finder of fact from inferring the retaliatory animus and thus causality required to sustain a cause of action.   Courts have noted that a three-month or greater interlude fails to provide the "stunningly obvious" timing that is required to allow a reasonable jury to find the requisite causal connection absent other corroborating evidence. *See Murray,* 853 F. Supp. 2d at 273; *see also Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir. 1990) (three and a half months insufficient); *McDowell v. North Shore – Long Island Jewish Health Sys.,* 788 F. Supp. 2d 78, 83 (E.D.N.Y. 2011) ("pursuant to the Second Circuit's authority, the Court finds that [a] greater than three month gap, unsupported by any other allegations showing plausible retaliation, is insufficient to raise an inference of retaliation"); *Ruhling v. Tribune Co.*, 04 Civ. 2430, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) ("[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line."); *cf. Gaetano & Assocs. Inc.,* 183 F. Appx. at 20 (temporal proximity found when massive lay-offs took place on the same day the employer was notified of the employees' intent to unionize).

The vast majority of the alleged adverse employment actions are far too remote to be classified as circumstantial evidence of a causal nexus.  Genova's last instances

of political support occurred in approximately early November, when he voted in the election and allegedly shook Germino's hand at a Veteran's Day Parade event. Genova Tr. at 25:8-24; 117:18-20.  Defendants failed to certify Genova as a Desk Officer in late March of 2012, which is over three months after the election took place. Genova Tr. at 102:16-22; Mandato Decl. ¶ 19; Mandato Tr. at 91:6-92:12.  The City's attempted and actual contact with Genova to arrange his fitness for duty exam, which Plaintiff argues was also retaliatory harassment, did not occur until late April through May 2012 – four to five months after the election. *See* Def. Ex. OO, NN. Genova resigned at the end of May 2012 – six months after the election.  *See* Def. Ex. TT.

Thus, the only arguably adverse actions that Genova claims to have experienced that fell within the two-month window were the hanging of the posters and the "penis" comments.  However, as already explained there is no evidence that the two posters were done with the express or implicit purpose of silencing Genova's speech or punishing him for it.  *See supra* at 43-45.  Similarly, there is no evidence to support the contention that the penis drawings that may have occurred at the earliest approximately one month after the election were related to Genova's political affiliation or were of a nature, intensity, or frequency as would reasonably dissuade or interfere with Plaintiff's First Amendment rights.  *See supra* 31-33.  Accordingly, Plaintiff has failed to provide sufficient evidence of the required causal link between the allegedly adverse employment actions and Plaintiff's exercise of his First Amendment rights.

5.    <u>Non-Retaliatory Justification for Transfer and Suspension</u>

Finally, even were the Court to conclude that a question of material fact exists regarding retaliatory animus, Defendants have put forth constitutionally appropriate non-retaliatory reasons underlying their conduct regarding Genova's employment, which Plaintiff fails to refute as pretextual.   Accordingly, Defendants motion for summary judgment should also be granted on this basis.   Once a defendant has presented a non-retaliatory reason for its employment actions, it is entitled to summary judgment "unless Plaintiff can point to evidence that reasonably supports a finding of prohibited [retaliation]." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000).   Nevertheless, where a retaliatory motive is shown to exist, a defendant may still be entitled to summary judgment if it shows that even without the improper motivation the alleged retaliatory action would have nevertheless occurred. *See Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir. 2003); *Milano v. Astrue,* No. 05 Civ. 6527, 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008).   Defendants have shown that Genova suffered from significant physical impairments as a result of his cancer treatment which justified his not returning to full patrol duty. *Compare* Genova. Tr. at 9:13-24, 10:4-12, 43:16-21, 44:7-18; Whitton Tr. at 44: 9-11; Whitton Decl. ¶ 12; Hall Decl. ¶ 11*;* Mandato Decl. ¶ 8; Def. Ex. WW 2172 *with Morris v. Lindau*, 196 F.3d 102, 114 (2d Cir. 1999) (abrogated on other grounds) (granting summary judgment in a First Amendment § 1983 retaliatory discharge case, where defendant made a showing that plaintiff officer was discharged due to wrist injury that resulted in his being able to perform only 90 percent of his duties that was not

shown to be pretextual based upon the evidence of presented).  With respect to Defendants' failure to certify Plaintiff as a Desk Officer and the decision to transfer him back to the Detective Division, Defendants have shown that there were documented concerns that Genova had difficulty multi-tasking as would reasonably be related to his hearing loss that presented a real safety concern were he to continue in that position.  *See* Def. Ex. V, W; Zoll Declaration ¶ 12.  Genova's co-workers and supervisors also observed that he struggled to hear and communicate with people over the phone and on the police radio.  *See id;* Genova Tr. at 103:18-19; Whitton Tr. at 46:4-24; Mandato Decl. ¶¶ 17-20; Mancusi Decl. ¶¶ 8-12; Pappachristou Decl. ¶¶ 20, 25.  Genova's deficiencies did not improve despite spending approximately 444 hours in training, which was well above the average training time for Desk Officers.  *See* Genova Tr. at 92:19; Whitton Tr. at 44:2-4; Mandato Decl. ¶ 21; Mandato Tr. at 69:13-16.  On February 8, 2012 (approximately two months into his Front Desk assignment), Genova visited his audiologist with a complaint that he was having "trouble understanding" 911 calls.  Pl. Ex. 52 626.  When the GCPD reassigned him back to the Detectives Division, Plaintiff suffered no loss in pay or benefits or any other objective detriment to his career with the GCPD.

Separate and apart from Plaintiff's documented inability to perform all of the required responsibilities of the Desk Officer position, Defendants also had a non-pretextual basis for disciplining Genova due to his violations of the Rules and Regulations.  It is not reasonably disputed that Genova's failure to personally report his arrest in connection with the May 22, 2012 domestic violence incident violated

47

Article VII § 30 of the Rules of Conduct. *See* Compl. ¶ 124; Genova Tr. at 74:15-19; Def. Ex. RR 001531; Whitton Tr. at 114-15; MacDonald Tr. at 72:8-24; Pl. Ex. 80; MacDonald Decl. ¶ 39; Def. Ex. L 001856.   Accordingly, the Defendants had a legitimate basis for seeking to discipline Genova and placing him on leave.

Finally, Genova's arguments that the City stopped and withheld his pay are unsupported by the evidence.   Initially, under Civil Service Law § 75, a municipal employer has the right to immediately suspend an employee served with disciplinary charges for up to 30 days.   N.Y. Civ. Serv. Law § 75.   Moreover, Civil Service Law § 72(5) also permits a municipal employer to place an employee, who the employer believes is at risk for serious harm to himself or others, on an unpaid leave of absence effective immediately.   N.Y. Civ. Serv. Law § 72(5).   Notwithstanding the City's right to stop his pay under the Civil Service Law, Genova continued to receive his pay through the date of his resignation, as reflected in his Social Security Disability Application.   Def. Ex. JJ, XX.   Regarding his alleged entitlement to Termination Pay, Article 18 of the CBA states that "there shall be no severance pay for a member [like Plaintiff] . . . who resigned with charges pending."   Def. Ex. GGG 000117.   Further, the CBA requires notification be given the fiscal year prior to separation from the department for payment at or near the time of separation.   *See* Hall Tr. at 23:6-16; Def. Ex. GGG Art. 18 § 4.   As such, Genova was not entitled to immediate or full Termination Pay upon his resignation.

The Court notes that Genova makes no real attempt to demonstrate that Defendants' otherwise lawful conduct was a pretext for unlawful retaliation beyond

wholly conclusory accusations that are not substantiated in the record. *See* Pl. Opp. at 19-20. Genova does not put forth any evidence beyond his individual perceptions and overarching suspicion that the City or the GCPD undertook any of the challenged actions against him premised upon his protected First Amendment activity. *See Joseph*, 5 F. Supp. 3d at 295, 313 (holding that employer's proffered reason for terminating African-American employee, a customer's complaint, was not pretextual where customer actually made complaint, such complaint was not racially motivated, and employer's decision to terminate employee rather than reassign him was supported by prior evaluations suggesting that employee needed to improve conflict management and communication skills). Plaintiff does proffer that there was a general awareness in the Department of Genova's friendship with and support of Germino or that many officers, including Hall, held negative views of Germino. *See, e.g.,* Mancusi Tr. at 42:8-44:7. Plaintiff further points to the fact that some of the individually named Defendants, not involved in any of the alleged adverse employment actions taken against Genova, were aware to varying degrees of Genova being teased. *See* Pl. Opp. at 16-19; Hall Tr. at p. 58:12-25-59:2; Pl. Ex. 48 01801-02. However, the Court declines to adopt Genova's suggestion that such awareness alone when viewed in context reasonably imputes animus to Whitton and Mandato or the Department as a whole. *See* Pl. Opp. at 17-18. For the reasons outlined above, as Plaintiff has failed to establish that the reasons proffered for Defendants' conduct were pretextual, Genova's First Amendment retaliation claim must be dismissed.

49

Accordingly, because Plaintiff has failed to establish an issue of material fact as to the existence of a hostile work environment, any substantive or detrimental differences in Genova's assignments such that they would constitute adverse employment actions, that any adverse employment actions were causally connected to his protected conduct, and that Defendants' justifications proffered for their actions were a pretext for unlawful conduct, the Court respectfully recommends that Defendants' motion for summary judgment regarding the causes of action claiming violations of Plaintiff's First Amendment rights be granted and that those claims be dismissed.

### B. **1983 Privacy Claim**

The Court next turns to Genova's claims under Section 1983 alleging that Glen Cove and the GCPD improperly accessed his medical records and, therefore, violated his rights to privacy and confidentiality under the Fourteenth Amendment, the second claim of the Complaint.[6] Again, to maintain an action under 42 U.S.C. § 1983, a plaintiff must allege two essential elements. First, "'the conduct complained of must have been committed by a person acting under color of state law.'" *Jainity v. Sarway*. 13-CV-0089, 2013 WL 816216, at *2 (E.D.N.Y. Mar. 5, 2013) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Second, "'the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Id.*   Defendants do not dispute that

---

[6] Defendants asserted that Plaintiff voluntarily withdrew their third cause of action, which claims a violation of New York Public Health Law § 18, Compl. ¶¶ 185-87. *See* Def. Mem. at 37 n. 6. Plaintiff proposed no opposition to this assertion and did not defend the claim in their papers. *See* Pl. Opp.   Accordingly, summary judgment on this cause of action is appropriate.

MacDonald was acting under "color of state law" when he went to the hospital to have Genova sign the medical release, and the Court accepts that individuals enjoy a constitutionally protected right to privacy regarding their medical records. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994). However, this right is not absolute. Where a government employer has reason to question whether an employee is medically fit to work, the employer may direct the employee to undergo a medical examination, *see Gargiul v. Tompkins,* 704 F.2d 661, 668 (2d Cir. 1983), *overruled on other grounds,* 790 F.2d 265 (2d Cir. 1986), and to provide the examining doctor with relevant medical records, *see Strong,* 902 F.2d at 212-13.

The express purpose of the release was to allow Glen Cove and the Department to obtain a copy of Genova's medical records so as to determine whether he was fit to return to work in any capacity. *See* Def. Ex. HH, BBB; MacDonald Decl. ¶ 34. Plaintiff cites to *O'Connor v. Pierson*, 426 F.3d 187, 202 (2d Cir. 2005), in an attempt to argue that simply because the records contained psychiatric information, that the signed waiver should not be credited due to allegedly heightened confidentiality concerns regarding such sensitive information. Pl. Opp. at 26. Although such records are due privacy protections, *O'Connor* does not stand for such an absolute proposition and is distinguishable. There, the school-board employer impermissibly demanded from a teacher seeking reinstatement broad, unrestricted access to records of substance-abuse treatment dating back over thirteen years, not only for its doctor to perform an examination but also generally for the Board itself and its representatives to review. *O'Connor*, 426 F.3d at 202 (2d Cir. 2005). There was no such demand or

51

precondition placed on Plaintiff here.   Instead, the records sought here were for the actual hospitalization that immediately precipitated Genova taking a leave of absence and were directly relevant to the fitness for duty evaluation that the Department was attempting to schedule.   *See* Def. Ex. BBB*;* MacDonald Decl. ¶ 34.

Additionally, Genova's 1983 privacy rights claim fails in light of his signing a witnessed written release of his medical records that waived whatever rights to privacy and confidentiality he had in those records and his hospitalization.   *See id.* In opposition, Plaintiff cites two cases urging the court to disregard or discount the HIPAA waiver.   *See* Pl. Opp. at 26.   However, neither of these cases actually dealt with a written or explicit waiver of any kind and are inapposite to the present matter. *See United States v. Mapp*, 476 F.2d 67, 77 (2d Cir. 1973) (holding that under the totality of circumstances, an officer who entered woman's bedroom with gun drawn and advised woman that she was under arrest and that officer wanted a package left by particular individual was required to take some minimal action designed to purge situation of its coercive pressures before consent to search could possibly be voluntary); *Doe v. Marsh*, 105 F.3d 106, 111 (2d Cir. 1997) (ruling that plaintiffs' actions identifying themselves as HIV-positive persons at conferences, seminars, and in educational videotapes constituted a "knowing and voluntary" waiver of their right not to have their HIV status disclosed to educators involved in HIV prevention generally).   Although these cases outline general principles regarding waivers, they are not dispositive of any of the issues regarding the HIPAA waiver presently at issue.

The Court also declines to accept Plaintiff's underlying argument that a hospitalized individual should be presumed to be unable to knowingly and voluntarily waive rights such as those conferred under HIPAA. *Compare* Pl. Opp. at 27 *with Brown v. Phillips*, CV-03-0361, 2006 WL 656973, at \*5 (E.D.N.Y. Mar. 13, 2006) (holding that petitioners waiver of rights in a hospital was voluntary despite being likely medicated having had surgery for a gunshot wound); *Ford v. Hoke,* 91 Civ. 4093, 1994 WL 594283, \*5 (E.D.N.Y. Oct. 25, 1994) (petitioner able to intelligently waive *Miranda* rights despite gunshot wound to his head, surgery, and injury to his eyesight); *see also Reinert v. Larkins,* 379 F.3d 76 (3d Cir. 2004) (state court determination that defendant was competent to waive his *Miranda* rights while being transported to hospital in an ambulance after being found in his home in a delirious state and with large slashes on his wrists was not contrary to, or an unreasonable application of clearly established federal law); *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir. 1989) (defendant recovering in hospital from a knife wound was sufficiently in control of his faculties to waive his constitutional rights).

Genova's Section 1983 privacy violation claim is premised on his theory that he was "ill, medicated, and receiving treatment for conditions that affect brain functioning," such that he was incapable of competently signing the medical release.[7]

---

[7] The Court also recognizes that Genova's Section 1983 claim, because it fundamentally deals with disclosure by Huntington Hospital to Defendants may be more accurately cast as a Health Insurance Portability and Accountability Act violation ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936. However, HIPAA does not provide Plaintiff with a private right of action. *Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) ("[C]ourts have held that HIPAA does not provide for either an express or implied private right of action."). Moreover, "a [p]laintiff's privacy right in his medical records is neither fundamental nor absolute." *Barnes v. Glennon,* 9:05-CV-0153, 2006 WL 2811821, at \*3 (N.D.N.Y. Sept. 28, 2006) (quoting *Crawford v. Manion*, 1997 WL 148066, at \*1 (S.D.N.Y. Mar. 31, 1997) (citing *Whalen v. Roe*, 429 U.S. 589, 603-04

Pl. Opp. at 27. Beyond Plaintiff's unsupported assertions that Genova was wholly
unaware of what he was signing and unable to resist due to his medication, there is
no evidence in the record substantiating that claim or even suggesting that the waiver
was not knowingly and voluntarily signed. *See id.* Plaintiff does not direct the court
to any actual evidence of medication or diagnosis in the relevant medical records. *Id.*
Further, there is no evidence of force, coercion, threats, intimidation, or deception on
the part of MacDonald nor does Plaintiff allege any such conduct. *Id.* at 26-27.
Instead, the evidence submitted shows that MacDonald visited Genova in the hospital
and asked him to sign the HIPAA waiver authorizations and Plaintiff complied.
Genova Tr. at 179:12; MacDonald Decl. ¶ 30; MacDonald Tr. at 19:13. The standard
medical release is readily comprehensible on its face, and a hospital employee, who
was a nurse, witnessed the signing. *See* Pl. Ex. 71.

Regardless, even were the court to assume there was a question of material
fact regarding Genova's waiver, Plaintiff does not delineate what demonstrable harm
he suffered due to the release of his medical records. *See* Pl. Opp. 26-28. Plaintiff
does not claim that Defendants took any adverse action based upon the information
that they learned in his medical records nor is there any evidence that the
information contained therein was improperly disseminated outside the Department
or the City in anyway. Additionally, there is no evidence in the record that Genova
personally suffered any discrimination, intolerance, or even a subjective level of

---

(1977); *Jarvis v. Wellman*, 52 F.3d 125, 126 (6th Cir. 1995))). Accordingly, Genova's privacy violation
cannot be wholly grounded upon the mere release of the records themselves to Defendants.

humiliation, shame, or embarrassment based upon the information contained in the medical records – a factor found necessary in actions alleging a violation of medical privacy rights.  *See Nolley v. Cty. of Erie*, 776 F. Supp. 715, 731 (W.D.N.Y. 1991) (holding that sensitive nature of HIV diagnosis and possibility of irrational stigma and scorn support finding that prison inmates have a protected constitutional right to privacy from the unwarranted disclosure of their HIV status).  In fact, Genova himself freely disclosed to Hall the central detail contained in the records at issue that he was admitted to the psychiatric department for treatment.  *See* Hall Tr. at 70:1-15, 74:1-10.

Accordingly, the Court respectfully recommends that summary judgment be granted in favor of the Defendants regarding the second and third causes of action in the Complaint alleging violations Plaintiff's right to privacy and confidentiality in his medical records.

## C. **Disability Discrimination Under the ADA and NYSHRL**

The Court next turns to Plaintiff's allegation that Defendants denied him a reasonable accommodation in violation of the ADA and NYSHRL and that they failed to engage in an interactive process to formulate a reasonable accommodation.  Compl. ¶¶ 200-05 (Claims 7, 8).[8]  Plaintiff specifies that the accommodation that Defendants

---

[8]  Plaintiff primarily alleges that Defendants' violated the ADA and NYSHRL by failing to engage in an interactive process to arrive at a reasonable accommodation.  *See* Compl. ¶¶ 200-05. However, there is no *per se* liability and thus no cause of action under the ADA or NYSHRL unless accommodation was possible and not provided.  *McBride v. BIC Consumer Prod. Mfg. Co.,* 583 F.3d 92, 101 (2d Cir. 2009).  "It is certainly true that an employer, by failing to engage in a sufficient interactive process, risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance that it will be found to have violated the ADA."  *Id.* (citing *Mengine v. Runyon,* 114 F.3d 415, 420-21 (3d Cir. 1997)).  However, showing mere failure to engage is not a substitute for establishing *a prima facie* case that a plaintiff was able to be

failed to provide was medical leave.  *See* Compl. ¶ 148.  As no reasonable view of the evidence supports Genova's causes of actions under the ADA and NYSHRL, as laid out below, the Court respectfully recommends that summary judgment be granted in favor of the Defendants and that these claims also be dismissed.

### 1.   ADA and NYSHRL generally

The three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S. Ct. 1817 (1973), applies to Plaintiff's claims of disability discrimination under both the ADA and the NYSHRL.  *See Katz v. Adecco USA, Inc.,* 845 F. Supp. 2d 539, 547-48 (S.D.N.Y. 2012); *Crawford-Bey v. N.Y. & Presbyterian Hosp.,* 08 Civ. 5454, 2011 WL 4530193, at *5 n. 6 (S.D.N.Y. Sept. 30, 2011) (noting that disability claims under the NYSHRL and NYCHRL involve the same elements as under the ADA).   Consistent with *McDonnell Douglas,* Plaintiff must first establish a *prima facie* case by setting forth:

> (1) plaintiff is a person with a disability under the meaning of the ADA;
> (2) an employer covered by the statute had notice of his disability;
> (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and
> (4) the employer has refused to make such accommodations.

*See* 42 U.S.C. § 12111(8), 12112(b)(5)(A); *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006) (citing *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).   With respect to the third and fourth elements, "'[t]he ADA envisions an 'interactive process' by which employers and employees work together

---

accommodated and the employer failed to provide a reasonable accommodation.  *Id.*  Accordingly, the Court focuses its analysis on these two issues.

to assess whether an employee's disability can be reasonably accommodated.'" *McBride,* 583 F.3d at 99-100 (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."). Nevertheless, the ADA does not impose liability for the refusal to explore all conceivable accommodations where, in the end, no accommodation was possible. *McBride*, 583 F.3d at 99-100 (citing 42 U.S.C. § 12112(a); 42 U.S.C. § 12112(b)(5)(A). In applying these standards, the Court appreciates that the burden to establish a *prima facie* case is "*de minimis.*" *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir. 2001) (internal quotation marks and citation omitted). Nevertheless, the Court finds that Genova has failed to meet this minimal requirement.

### 2. Plaintiff is Not a Qualified Individual under the ADA or NYSHRL

Summary judgment on Genova's ADA and NYSHRL claims is appropriate because Plaintiff fails to put forth a showing that Genova is in fact a qualified employee who could have been reasonably accommodated. Defendants do not dispute that Genova has a qualifying disability, specifically his cancer and the side effects of its treatment. *See* Human Rights Complaint (listing Plaintiff's relevant disability as "Cancer, Hearing Loss, Residual effect of Cancer"); Def. Mem. at 24. However, the term "qualified individual" is defined by statute to be a person "who, with or without reasonable accommodation, can perform the essential functions of the employment

57

position that such individual holds or desires." 42 U.S.C. § 12111(8). Although reasonable accommodation is a flexible concept, it can never involve the elimination of an essential job function. *Shannon v. New York City Trans. Auth.,* 332 F.3d 95, 100 (2d Cir. 2003).

Under this statutory definition, Genova was not, in fact, a qualified individual. In other proceedings, Plaintiff represented to the Social Security Administration ("SSA") that he was permanently disabled and unable to work. *See supra* at 17-18. The SSA ultimately agreed and awarded him benefits. *See id.*; Def. Ex. WW, XX. Such a classification, as a matter of law, presents a significant hurdle for Plaintiff in the present context, which he fails to clear. *See Myers v. Knight Protective Services, Inc.,* 2012 WL 123120, *3 (W.D. Okl. 2012) (holding that a plaintiff, who testified at Social Security Disability hearing to his inability to work cannot defeat summary judgment simply by contradicting that previous statement). In *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06, 119 S. Ct. 1597, 1603 (1999), which Plaintiff cites in his memorandum of law, Pl. Mem. of Law 31, n. 4, the Supreme Court did find that an SSD determination does not wholly preclude a recipient of SSD benefits from arguing that he/she is a "qualified individual." *Cleveland*, 526 U.S. at 797-98. However, the Court also held that "[t]o survive a defendant's motion for summary judgment, [a plaintiff] must explain why that [SSD] contention is consistent with her ADA claim that she could perform the essential functions' of her previous job, at least with reasonable accommodation." *Id*. at 798 (internal quotation marks removed); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 333 (2d Cir. 2000) (noting that

summary judgment may be appropriate under *Cleveland* where the SSD and ADA claims involve directly conflicting statements about purely factual matters). Plaintiff here fails to meaningfully argue from the evidence that the two conflicting positions are reconcilable. *See* Pl. Opp. 31-32. Instead, in a footnote, Genova notes simply that he applied for Social Security after the incidents alleged in his causes of action forced him to resign and on the advice of counsel. *See id.* at 31 n. 4. This explanation wholly fails to address the actual factual inconsistency at the heart of the issue as to whether Plaintiff is unable to work at all, as he argued successfully to obtain SSD benefits on the one hand, and that he is able to do his job with an accommodation, as he argues here in support of his ADA and NYSHRL claims on the other.

Instead of attempting to reconcile these two contrary positions, Genova impermissibly alters the basis for his ADA claim, arguing for the first time that his underlying disability is a psychological disorder rather than his cancer. *See* Pl. Opp. at 29-30. However, because Genova failed to file a Human Rights Complaint or EEOC Charge alleging that he had a psychological disability, such a claim is barred here for failing to exhaust administrative remedies, and cannot be raised now to explain how additional undisturbed medical leave would have reasonably accommodated him and allowed him to recover. *See* Def. Ex. HHH (Genova articulates his disability to be "Cancer, Hearing Loss, Residual effect of Cancer."); *Cooney v. Consol. Edison*, 220 F. Supp. 2d 241, 253 (S.D.N.Y. 2002) ("A party may not raise new claims for the first time in response to a motion for summary judgment."); *Jacques v. DiMarzio, Inc.,* 216 F. Supp. 2d 139, 143-44 (E.D.N.Y. 2002); *Joseph v. Am. Works, Inc.*, 01 Civ. 8287,

2002 WL 1033833, at *5 (S.D.N.Y. May 21, 2002); *Glozman v. Retail, Wholesale & Chain Store Food Employees Union*, 204 F. Supp. 2d 615, 629-30 (S.D.N.Y. 2002); *see also* 42 U.S.C. § 12117(a) (incorporating into the ADA, by reference, Title VII's enforcement scheme, codified at 42 U.S.C. § 2000e–5(e)(1), which requires exhaustion of administrative remedies).[9]   Therefore, as Plaintiff has failed to exhaust his administrative remedies with respect to his newly alleged psychological-condition disability, that claim cannot now be asserted for the first time in support of his ADA/NYSHRL claims at summary judgment.

Accordingly, Defendants' motion for summary judgment with respect to the ADA/NYSHRL causes of action should be granted in favor of Defendants because Genova cannot be classified as a "qualified individual" with a disability.

### 3.   Plaintiff's Requested Accommodation is Unreasonable

Next, with respect to the final prong of the *McDonnell Douglas* test, refusal to make a reasonable accommodation, the Court finds no evidence in the record that the GCPD failed to provide Plaintiff with reasonable accommodations before, during, or after his hospitalizations in April and May of 2012, including modified duty and medical leave.

First, the Court turns to the accommodation of medical leave that is argued in the Complaint.  A medical leave of absence may constitute an appropriate form of

---

[9] Genova's current argument might be permissible were it demonstrated that the psychological condition Plaintiff is presently articulating was "reasonably related" to the claims contained in his Human Rights Complaint. *Williams v. New York City Housing Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir. 2001); *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)).  Regardless, Genova does not try to satisfy the "reasonably related" requirement, and there is no evidence in the record as would support the Court determining this on its own.

accommodation under the ADA. *Micari v. Trans World Airlines, Inc.*, 43 F. Supp. 2d 275, 281 (E.D.N.Y.), *aff'd*, 205 F.3d 1323 (2d Cir. 1999). When an employer grants such a request for medical leave, however, unless a plaintiff puts forth evidence that the accommodation as provided was not reasonable or that there existed some additional reasonable accommodations that were necessary, the plaintiff cannot sustain its burden that a defendant failed to accommodate a disability. *Romanello v. Shiseido Cosmetics Am. Ltd.*, 00 CIV. 7201, 2002 WL 31190169, at *10 (S.D.N.Y. Sept. 30, 2002), *aff'd*, 71 F. App'x 880 (2d Cir. 2003) (granting defendant employer's motion for summary judgment when employer had granted employee's requests for multiple leaves of absence, employee failed to communicate with employer about her condition and ability to return to work, and plaintiff never put forth any reasonable accommodations which the employer rejected).

The record is clear that Genova was granted extended paid medical leave and Plaintiff has put forth no evidence that the City ever denied any requests for leave up and until the moment he resigned after the lodging of the two disciplinary charges against him related to his arrest for domestic violence and his failure to report for his fit for duty examination. *See supra* 31-48; Def. Ex. JJ; Pl. Ex. 65. Additionally, and contrary to Plaintiff's suggestion, Defendants never ordered Genova to return to work during his leave to engage in actual employment activities. *Compare* Pl. Opp. 31-32; Compl. ¶ 195 *with* Def. Ex. HH, NN, OO. Therefore, the only requested accommodation that Defendants failed to provide was that Plaintiff not be contacted

in anyway nor required to substantiate his need for a leave of absence through a fitness for duty examination. *See* Pl. Opp. 31-33.

These requests, however, do not constitute a violation of the ADA because they are not reasonable as a matter of law. In determining the reasonableness of the accommodation, the Court notes that employers are not required to provide a perfect accommodation nor are they bound by the employee's preference. *See* 29 C.F.R. § 1630. ("[Although] the preference of the individual with a disability should be given primary consideration[,] ... the employer providing the accommodation has the *ultimate discretion* to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.") (emphasis added); *see Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015) (ADA does not require provision of "a perfect accommodation or the very accommodation most strongly preferred"); *see also Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) (holding that, under the Rehabilitation Act, the employer is not required "to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable."). A reasonable accommodation is one that "'enable[s] an individual with a disability who is qualified to perform the essential functions of that position ... [or] to enjoy equal benefits and privileges of employment.'" *Noll,* 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2(o)(1)(ii), (iii)).

The Court is mindful that the reasonableness of a requested accommodation is a fact-specific inquiry that normally would be left to the factfinder. *Noll*, 787 F.3d at

94 (2d Cir. 2015).  Nevertheless, in a case such as this where the employer has attempted to accommodate the plaintiff's disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is plainly reasonable. *Id.* (citing *Wernick v. Fed. Reserve Bank of N.Y.,* 91 F.3d 379, 385 (2d Cir.1996)).  Under such circumstances, this "ends the analysis, and there is no need to engage in further burden-shifting." *Id.* (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400-02, 122 S. Ct. 1516 (2002); *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 137-38 (2d Cir. 1995)).

In opposition, Plaintiff essentially argues that the reasonable accommodation would have been a leave of absence without any anticipated return date, no contact, and no substantive explanation as to why such leave was necessary or anticipated to be an effective accommodation. *See* Pl. Opp. 30-36.  This argument fails as a matter of law. *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 9 (2d Cir. 1999) (holding that school board was not required under ADA to grant disabled head custodian an indefinite leave of absence, especially in light of custodian's prior inconsistent assertions, to which custodian was bound by estoppel, that he was totally disabled, and the absence of any indication from him in his correspondence with school board that, aside from restructuring his position to sedentary duties, he expected to be able to return); *Stamey v. NYP Holdings, Inc.*, 358 F. Supp. 2d 317, 328 (S.D.N.Y. 2005) (citing *McNeil v. Scotland County*, 213 F. Supp. 2d 559 (M.D.N.C. 2002) (holding that "[b]ecause an indefinite leave of absence is not an accommodation required by the ADA, [p]laintiff's ADA claim fails as a matter of law")); *Wisneski v.*

63

*Nassau Health Care Corp.*, 296 F. Supp. 2d 367, 374 (E.D.N.Y. 2003) ("There is ample case law stating that the ADA does not require an employer to grant an employee an indefinite leave of absence.") (collecting cases); *see also Wood v. Green*, 323 F.3d 1309 (11th Cir. 2003) (finding that there is nothing in the text of reasonable accommodation provision of the ADA which requires an employer to wait for an indefinite period for accommodation to achieve its intended effect). Accordingly, Plaintiff's argument that his leave should have been indefinite and without any contact from Defendants is unreasonable, and the Court respectfully recommends that Defendants' motion for summary judgment be granted and that Plaintiff's ADA and NYSHRL claims be dismissed on this alternate ground.

### D. **FMLA Interference/Retaliation**

The Court next turns to Plaintiff's allegations that Defendants interfered with and retaliated against him for taking leave guaranteed to him under FMLA. These claims also fail as a matter of law. For the reason laid out below, the Court recommends that Defendants' motion for summary judgment be granted with respect to these causes of actions, the fifth and sixth claims in the Complaint.

#### 1. FMLA generally

Under Section 2612 of the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(C)-(D). Following qualified leave, an employee is entitled to reinstatement to the same or an equivalent position. 29 U.S.C.

§ 2614(a)(1). Interfering with, restraining, or denying an employee's rights under the FMLA is unlawful as is retaliating against such an individual after he/she has exercised or attempted to exercise those same rights. 29 U.S.C. § 2615(a)(1)-(2); 29 C.F.R. § 825.220(c); *see also Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004) (per curiam). The Second Circuit recognizes separate and distinct claims for interference and retaliation under the FMLA. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006); *see also Potenza*, 365 F.3d at 167 (discussing the distinction between interference and retaliation claims under the FMLA). Though Genova asserts both theories of liability, neither claim is supported by evidence sufficient to survive summary judgment. *See* Compl. ¶¶ 194-199.

2.    <u>Interference</u>

To prevail on his FMLA interference claim, Plaintiff must establish that:

(1) Plaintiff is an eligible employee under the FMLA;
(2) Defendant is an employer as defined by the FMLA;
(3) Plaintiff was entitled to take FMLA leave;
(4) Plaintiff gave notice to Defendant of his intention to take such leave; and
(5) Plaintiff was denied benefits to which he was entitled under the FMLA.

*Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (setting forth elements). There is no dispute that Plaintiff was an eligible employee under the FMLA, that Defendant is an employer subject to the FMLA, and that Plaintiff was entitled to take FMLA leave. Putting aside the question of proper notice, which the parties dispute, the Court focuses on the fifth element, namely whether the GCPD denied Genova FMLA benefits to which he was entitled. With respect to this element, Plaintiff does not claim that Defendants denied him leave, but rather that by

65

contacting him, attempting to have him examined by a department physician and/or psychiatrist, and then placing him on administrative leave during the relevant time period, Defendants interfered with his FMLA rights.  *See* Pl. Opp. at 35-37.[10]  The Court disagrees.

First, Defendants did not violate Genova's rights under FMLA simply by attempting to contact him while he was out on paid sick leave.  Employers do not commit an unlawful act simply by contacting an employee to ascertain details regarding the employee's medical condition.  *See Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 402 (S.D.N.Y. 2007) (detailing employer's repeated efforts to contact employee to obtain information justifying and then clarifying required leave of absence under FMLA); *see also Barnes v. City of Coon Rapids, Minn.,* Civ. 07-3672, 2009 WL 1178555, at *4 (D. Minn. Apr. 30, 2009) (finding that municipal employer acted in good faith when it repeatedly attempted to contact employee out on FMLA leave to clarify his medical condition).  Additionally, limited contact even regarding the employee's work is also permissible so long as the employee is not forced against his will to engage in actual work during his leave.  *See Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009) ("Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise

_____

[10] Plaintiff also asserts that the City interfered with Genova's rights under FMLA by recording his time off as sick days as opposed to FMLA days.  *See* Pl. Opp. at 35.  However, the simple failure to designate explicitly an employee's leave as FMLA leave does not alter any of his relevant rights or responsibilities.  *See* 29 U.S.C. § 2612(d)(2); *Fulham v. HSBC Bank USA*, 99 CIV. 11054, 2001 WL 1029051, at *4 (S.D.N.Y. Sept. 6, 2001) (holding that the fact that the employer did not redesignate vacation days as FMLA days was irrelevant in determining whether employer defendant had met his obligations under the statute).  Additionally, the statute does not impose any requirement of advance designation of sick leave as FMLA leave.  *See id.*

66

of an employee's FMLA rights.") (citing *Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886, 910–11 (E.D. Mich. 2007) (holding that, when employee was granted paid-sick leave, even repeated requests that the employee review documents and other work-related phone calls did not in and of itself, without proof that employee was actually forced to do work from home or retaliated against for not doing so, substantiate an FMLA violation)).

Regarding contact between Defendants and Plaintiff by phone, Genova provides a transcript of undated voicemails from Mandato, (presumably) Mancusi, Father Joseph D'Angelo (a police chaplain), and Lieutenant Frank Bruschini. *See* Pl. Ex. 90. The substance of each message reasonably establishes a legitimate concern regarding Plaintiff's welfare and suggests that Defendants were not fully aware at times of Genova's condition or whereabouts. *See id.* The transcript details calls that ask Plaintiff to call back colleagues and supervisors; others hoping he is well, wondering why callers cannot get ahold of Genova; one wishing him a happy Easter and expressing concern for him and that he is missed, and one from MacDonald requesting a doctor's note explaining his absence and telling Plaintiff that if he is going to cancel his appointment with the psychiatrist he must inform the Department as soon as possible because it would cost a thousand dollars. *See id.* Further, the Court notes that the voicemail messages, according to Plaintiff, were made between "late March and early April of 2012." Genova Decl. ¶ 122; Declaration of James Loiacono ("Loiacono Decl.") ¶¶ 20-28; Pl. Ex. 77 at 240-241. Accordingly, some of the calls to which Plaintiff cites predate Genova's medical leave and the remaining phone

67

records show that MacDonald contacted him once on April 20, 2012 for two-minutes and once on May 14, 2012 for two minutes.  *See* Pl. Ex. 77 at 242-243.  Although not readily reflected in the phone records submitted by Plaintiff, Hall testified at his deposition to having attempted to contact Genova on several occasions by phone in his roll as Union President to ascertain his condition.  *See* Hall Tr. at 68:10-25, 70:1-15, 74:1-10.  On at least one occasion, Hall spoke to Plaintiff after he was released from the hospital, which was when Hall learned from Genova that he had gone inpatient for psychiatric reasons.  *See id.*  However, Hall stopped all communications with Genova when he learned that Plaintiff had alleged the contact was upsetting him.  *See* Hall Decl. ¶¶ 40-41.  Regarding the number of text messages that Plaintiff urges the Court to deem harassing, MacDonald sent Genova two text messages – one on May 14, 2012 requesting him to report to the police station for the purpose of a fitness for duty examination and the second on May 24, 2012 after he failed to attend the examinations and had been arrested for domestic violence.  *See* Def. Ex. NN, OO.

These intrusions were limited in nature and legitimately premised on ascertaining Genova's medical condition and attempting to reschedule a fit for duty examination that had been initially scheduled before he went out on leave.  *See* Pl. Ex. 73.  The rescheduled examination was for after Genova left the hospital when Defendants did not know whether Plaintiff planned to return to work.  *See id.;* Whitton Decl. ¶¶ 54, 55.  Accordingly, the Court finds that this contact does not, as a matter of law, substantiate a violation of Plaintiff's rights under the FMLA.

68

More specifically, with regard to Defendants' request that Genova submit to a fit for duty examination by the Department physician/psychiatrist during his leave, an employer's attempt to schedule a statutorily required medical/psychiatric examination, the purpose of which is to ascertain an employee's medical fitness for his job and that he is not a threat to himself or others, does not violate the FMLA. *See Museau*, 2014 WL 1277006, at *5 (granting summary judgments for defendants when only evidence of FMLA violation was limited work-related contact between employee and employer and occasional requests that employee interrupt leave to attend work-related meetings or events); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427, 430-431 (S.D.N.Y. 2004) (holding that employer's requiring the submission of weekly progress reports about employee's substance abuse program treatment during FMLA leave did not constitute interference); *cf. Brady v. Dammer*, F. Supp. 2d 712, 720 (N.D.N.Y 2008) (holding that State's requirement that employee submit to medical examination pursuant to New York Civil Service Law section 72 after she requested extended sick leave did not, without more, constitute adverse employment action sufficient to support employee's retaliation claim under ADA, even if request was inappropriate).  Accordingly, the limited unsuccessful attempts to have Genova attend an examination or come into the station after his arrest did not interfere with or deprive him of any rights guaranteed under the FMLA and summary judgment as to this cause of action is appropriate.

Collectively the evidence demonstrates that Defendants contact with Genova was limited and for the legitimate purposes of attempting to verify Plaintiff's medical

condition and leave status and to arrange for him to submit to a fit for duty examination.  Based on the foregoing, the Court respectfully recommends that Defendants' motion for summary judgment be granted and the sixth cause of action alleging interference with Plaintiff's rights under FMLA be dismissed.

### 3.    Retaliation

Plaintiff also alleges an FMLA violation under a retaliation theory, claiming that Defendants unlawfully withheld his salary and constructively discharged him because he exercised his statutory rights.  *See* Compl. ¶¶ 197-99.  To evaluate a retaliation claim arising under the FMLA, courts use the same three-step burden-shifting analysis laid out in *McDonnell Douglas*.  *See Potenza*, 365 F.3d at 168.  A *prima facie* case of retaliation under the FMLA requires Plaintiff to show:

> (1) he exercised rights protected under the FMLA;
> (2) he was qualified for his position;
> (3) he suffered an adverse employment action; and
> (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."

*Barletta v. Life Quality Motor Sales Inc.,* 13 CV 02480, 2016 WL 4742276, at *3-4 (E.D.N.Y. Sept. 12, 2016).

Applying these standards, Plaintiff's claim fails because Genova did not suffer an adverse employment action after he took FMLA leave.  As set forth above, Genova was not constructively discharged.  *See supra* at 40-46.  He resigned after being told repeatedly that he was not being terminated, that he could take an unpaid leave of absence that held his position for up to a year, and while he had disciplinary charges pending.  *See supra* at 13-18.  Further, and as also set forth above, his salary was not improperly withheld. *See id.*  Accordingly, Plaintiff's FMLA retaliation claim like his

First Amendment claim fails as a matter of law, and Defendants' motion for summary judgment on this cause of action should be granted.

## IV.    CONCLUSION

For the reasons set forth herein, the Court respectfully recommends that Defendants' motion for summary judgment be granted in its entirety, and all of Plaintiff's causes of action be dismissed.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.    Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report.    Failure to file objections within the specified time waives the right to appeal the District Court's order.    *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


Dated:    Central Islip, New York
        February 22, 2017


                        s/ Steven I. Locke
                        STEVEN I. LOCKE
                        United States Magistrate Judge